MINNESOTA LAWYERS MUTUAL
INSURANCE COMPANY

v.

Thomas J. AHRENS, Esquire; Ahrens Law Firm, P.C.; David E. Ricker; Randall Wagner; John Jarboe; Larry L. Hatter; James J. Green, Sr.; Keith Hostler; Angela Hickey; Orrel E. Picklesimer, Executor of the Estates of Edsel Picklesimer; Mark Randall; Neil Barr

David E. Ricker, Appellant

Minnesota Lawyers Mutual
Insurance Company

v.

Thomas J. Ahrens, Esquire; Ahrens Law Firm, P.C.; David E. Ricker; Randall Wagner; John Jarboe; Larry L. Hatter; James J. Green, Sr.; Keith Hostler; Angela Hickey; Orrel E. Picklesimer, Executor of the Estates of Edsel Picklesimer; Mark Randall; Neil Barr

Randall Wagner; John Jarboe; Larry L. Hatter; James J. Green, Sr.; Keith Hostler; Angela Hickey; Orrel E. Picklesimer, Executor of the Estate of Edsel Picklesimer; Mark Randall; Neil Barr, Appellants.

Nos. 10–2779, 10–2780.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) June 23, 2011.

Filed: June 23, 2011.

Anthony P. Demichele, Esq., Brett Littman, Esq., John F. O'Brien, Esq., Paul E. Peel, Esq., O'Brien & Ryan, Plymouth Meeting, PA, for Minnesota Lawyers Mutual Insurance Company.

David H. Cook, Esq., Farrell & Reisinger, Pittsburgh, PA, Charles O. Beckley, II, Esq., John G. Milakovic, Esq., Beckley & Madden, Harrisburg, PA, Thomas R. Hurd, Esq., Matthew A. Lipman, Esq., McElroy, Deutsch, Mulvaney & Carpenter, Philadelphia, PA, for Thomas J. Ahrens, Esquire; Ahrens Law Firm, P.C.; David E. Ricker; Randall Wagner.

Before: HARDIMAN, GREENBERG,

Circuit Judges and POLLAK * District Judge.

## OPINION OF THE COURT

HARDIMAN, Circuit Judge.

Minnesota Lawyers Mutual Insurance Co. (MLM) sought a declaration that an insurance policy issued to Thomas Ahrens, Esq. and his law firm (collectively, Ahrens) did not oblige MLM to defend or indemnify Ahrens in two Pennsylvania suits brought by clients of the firm. The District Court granted judgment on the pleadings and the clients appealed. Essentially for the reasons stated in the District Court's well-reasoned opinions, we will affirm.

## I

Because we write for the parties, we recount only the essential facts and procedural history.[1] Under Pennsylvania law, an insurer's duty to defend is determined by comparing the allegations in the third parties' complaint(s) to the conditions of the insurance policy at issue, so the facts are drawn from the clients' Pennsylvania state court complaints. *See Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 226–27 (3d Cir.2005) (citing *Gen. Accident Ins. Co. of Am. v. Allen*, 547 Pa. 693, 692 A.2d 1089, 1095 (1997)). In addition, the procedural posture of the case obliges us to construe all facts and inferences in the light most favorable to the clients. *E.I. DuPont de Nemours & Co. v. United States*, 508 F.3d 126, 132 (3d Cir.2007).

Under the policy at issue, MLM insured Ahrens for losses "resulting from the rendering or failing to render PROFESSIONAL SERVICES while engaged in

the private practice of law." "Professional services" were defined in relevant part as "legal or notary services for others." At the same time, Exclusion 13 to the policy excluded coverage for "any CLAIM arising out of the solicitation or sale of specific securities or specific investments by [Ahrens]." The only issue on appeal is whether Exclusion 13 precludes coverage for the allegations in the clients' state court complaints.

In late 2008 and early 2009, Ahrens spoke individually with ten of the firm's clients about a money-making opportunity. Ahrens described the opportunity differently to different clients, calling it variously a "loan" or an "investment." Although the details varied from client to client, generally Ahrens convinced his clients to transfer money to him which he would in turn transfer to another client, Alfred Madeira. Ahrens said Madeira was working with a financial "whiz kid" named Sean Healy who was making large amounts of money trading gold and commodities futures. Ahrens told his clients that Madeira and Healy had a bank account that had been temporarily frozen by regulators, showing some clients an account statement with a balance of $79,000,000. Ahrens said Madeira and Healy needed cash to continue investing in commodities futures. He promised extravagant returns ranging from 20% to 50% within a few months, and assured his clients that, at the very least, any money given to Madeira and Healy would be repaid from the account once it was unfrozen. All told, over $9,000,000 was transferred from the ten clients to the Ahrens firm's escrow account and from there to Madeira. To facilitate these transactions, Ahrens provided a number of

---

* The Honorable Louis H. Pollak, Senior Judge for the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

1. The District Court had diversity jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

services, including executing and notarizing notes and documents memorializing the transactions, and preparing mortgages on a property owned by Madeira to secure the contributions of at least three of the clients.

Unsurprisingly, the too-good-to-be-true opportunity touted by Ahrens turned out to be just that. Healy and his wife were operating a Ponzi scheme and instead of investing the clients' money in commodities futures used it to repay former investors and fund their lavish lifestyle in Florida. The bank statement showing a $79,000,000 balance in "frozen" funds was a fraud, and the mortgages on property owned by Madeira turned out to be the fourth, fifth, and sixth mortgages on the same property, whose fair market value was less than the amount for which it had been mortgaged. Finally, while the clients allege that Ahrens was an unwitting dupe of the Ponzi scheme, they simultaneously allege that Ahrens expected Madeira to pay him one dollar in "legal fees" for each dollar Ahrens brought into the scheme.

When it became clear that they would neither be repaid nor receive the extravagant returns they had been promised, the clients sued Ahrens in the Court of Common Pleas of Cumberland County, Pennsylvania. David Ricker brought one suit and the nine other clients (collectively, the Wagner Appellants) brought another. Ricker's second amended complaint and the Wagner Appellants' complaint both alleged state law claims for legal malpractice, negligent misrepresentation, and breach of fiduciary duty.

In August 2007, MLM filed a complaint against Ahrens and the clients in District Court seeking a declaratory judgment that it had neither a duty to defend nor a duty to indemnify Ahrens in the two Cumberland County lawsuits. The Wagner Appellants filed an answer and counterclaim seeking a declaration that MLM had a duty to indemnify Ahrens. In March 2010, after the pleadings were closed, Ricker and the Wagner Appellants filed motions for judgments on the pleadings under Federal Rule of Civil Procedure 12(c).

The District Court denied the clients' motions and entered judgment for MLM, declaring that MLM had no duty to defend Ahrens in the state court suits because all of the clients' claims arose out of Ahrens's solicitation of the investment opportunity with Madeira and Healy, which was subject to Exclusion 13 of the insurance policy. The Wagner Appellants moved for reconsideration and to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), arguing that: (1) the District Court had erred by granting a judgment on the pleadings for MLM when MLM had not moved for it; and (2) Exclusion 13 should not apply because they made "loans," not "specific investments" and because their claims did not "arise out of" Ahrens's solicitation of specific investments. Noting that a district court can grant a judgment on the pleadings *sua sponte* but that the clients had no notice of its intent to enter judgment for MLM, the District Court applied the more favorable standard for a motion for judgment on the pleadings rather than the more restrictive standard for a Rule 59(e) motion. Despite the more lenient standard, the Court denied the motion, finding that no matter how the clients characterized their claims, Exclusion 13 applied and MLM had no duty to defend or indemnify Ahrens because the claims arose out of the solicitation of specific investments.

Ricker and the Wagner Appellants appealed, and their appeals were consolidated. Ahrens declined to participate in the appeal.

## II

Given the unusual procedural posture of this case—including a grant of judgment on the pleadings for a nonmoving party, resulting in a Rule 59(e) motion that the District Court considered under the Rule 12(c) standard—we will apply the standard of review for an appeal from the grant of a Rule 12(c) motion, which we have articulated as follows:

> Our standard of review of a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is plenary. Under Rule 12(c), judgment will not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law. In reviewing the grant of a Rule 12(c) motion, we must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party.

*Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir.2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir.1988)). Accordingly, we will treat MLM as the movant and the clients as the nonmoving party, viewing the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to them.

Interpretation of an insurance policy is a question of law. *Sikirica*, 416 F.3d at 220. If the words of an insurance policy are clear and unambiguous, the court must give them their plain and ordinary meaning. *Id.* (citing *Pac. Indem. Co. v. Linn*, 766 F.2d 754, 760–61 (3d Cir.1985)). When a term is ambiguous, and the intentions of the parties cannot be discerned from the policy, the court may look to extrinsic evidence. *Id.* Ambiguous terms must be strictly construed against the insurer, but the policy language must not be tortured to create ambiguities where none exist. *Id.*

## III

Because we sit in diversity, we apply Pennsylvania substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). We have had occasion to apply the relevant law before, which we summarized as follows:

> Under Pennsylvania law, an insurer has a duty to defend if the complaint filed by the injured party potentially comes within the policy's coverage. The duty to defend is a distinct obligation, different from and broader than the duty to indemnify. Because the duty to defend is broader than the duty to indemnify, there is no duty to indemnify if there is no duty to defend. After determining the scope of coverage under a policy, the court must examine the complaint in the underlying action to determine whether it triggers coverage. If the complaint avers facts that might support recovery under the policy, coverage is triggered and the insurer has a duty to defend. Both the duty to defend and the duty to indemnify flow from a determination that the complaint triggers coverage.

*Sikirica*, 416 F.3d 214, 225–26 (internal quotation marks and citations omitted).

On appeal, the clients raise similar arguments to those presented to the District Court in the Rule 59(e) motion: (A) the District Court should have deferred granting judgment on the pleadings; (B) at least some of the transactions at issue were "loans," not investments; and (C) their claims do not "arise out of" the solicitation of specific investments. We address these arguments seriatim.

## A

"The district court may on its own initiative enter an order dismissing [an] action

provided that the complaint affords a sufficient basis for the court's action." *Bryson v. Brand Insulations, Inc.* 621 F.2d 556, 559 (3d Cir.1980). Likewise, district courts can "enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The notice requirement is satisfied when a case involves "the presence of a fully developed record, the lack of prejudice, [and] a decision based on a purely legal issue." *Gibson v. City of Wilmington,* 355 F.3d 215, 224 (3d Cir. 2004).

Here, the record was fully developed because courts determine whether coverage exists by comparing the policy and the complaint in the underlying action. *See Gen. Accident Ins. Co. of Am.,* 692 A.2d at 1095. And because "[t]he interpretation of an insurance contract is a question of law[,]" the issue before the District Court was purely legal. *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.,* 589 Pa. 317, 908 A.2d 888, 897 (2006); *see Gardner v. State Farm Fire & Cas. Co.,* 544 F.3d 553, 558 (3d Cir.2008). Finally, because (1) MLM requested a judgment in its favor in its brief opposing the clients' Rule 12(c) motion; (2) the clients had opportunities to argue against such a judgment in their reply to MLM's brief and in their Rule 59(e) motion briefing; and (3) the District Court reviewed the Rule 59(e) motion under the less stringent Rule 12(c) standard, we are convinced that there was no prejudice. For these reasons, it was not error for the District Court to enter judgment on the pleadings.

**B**

■ The clients claim the District Court erred when it determined that the transactions at issue were "specific investments," as that term is used in Exclusion 13 of the policy. They argue that because some of their averments described the transactions as "loans," they were not investments.

Like the District Court, we are convinced that the transactions at issue were investments, as that term is normally understood and as it is used in the policy.[2] Although the clients sometimes call the transactions "loans" and call their expected returns "interest," the clients' descriptions do not end the inquiry. *Mut. Ben. Ins. Co. v. Haver,* 555 Pa. 534, 725 A.2d 743, 745 (1999) ("[T]o allow the manner in which the complainant frames the request for redress to control in a case such as this one would encourage litigation through the use of artful pleadings designed to avoid exclusions in liability insurance policies."). The facts as pleaded in the clients' state court complaints indicate that the clients expected to profit from Healy's success in the gold and commodities futures markets, and that their expected returns depended upon that success, not on an interest rate. And while the clients were no doubt influenced by Ahrens's promises that they would be repaid by a fixed date, and some of them sought mortgages to further secure their investments, that did not convert their speculative investments into loans.[3]

**2.** We do not understand the District Court to have held, as the clients suggest in seeking to have its ruling overturned on appeal, that all loans are necessarily "investments" for purposes of Exclusion 13, but rather that the specific transactions in issue in this case were investments, and it is on that basis that we are affirming the District Court's orders.

**3.** The clients' secondary argument—that Ahrens did not solicit *specific* investments because they did not know exactly how Healy would use their money—also fails because, as the District Court explained, the clients made specific investments of specific sums of money in the Madeira–Healy scheme. As an illustration, providing working capital to a firm

The District Court referred to the definition of "investment" from a standard dictionary: "an expenditure of money for income or profit." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1190 (1993). The Wagner Appellants argue that this definition is too general and that the Court should have instead relied upon a more specific definition like those found in Black's Law Dictionary—"an expenditure to acquire property or assets to produce revenue; a capital outlay," BLACK'S LAW DICTIONARY 902 (9th ed.2009)—or in federal precedents defining similar terms. *See Steinhardt Group v. Citicorp,* 126 F.3d 144, 151 (3d Cir.1997) (defining "investment contract" as used in federal securities law) [4]; *Fin Hay Realty Co. v. United States,* 398 F.2d 694, 695 (3d Cir.1968) (distinguishing between shareholders' contributions of capital to a close corporation and loans on which interest payments were deductible for tax purposes). "Words of common usage in insurance policies are to be construed in the natural, plain, and ordinary sense, and [a court] may inform [its] understanding of these terms by considering the dictionary definitions." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 108 (1999). Accordingly, the District Court did not err when it used a standard dictionary to define "investment," or when it eschewed reliance on our precedents that defined related terms in other contexts.

The clients also urge us to find that the District Court should have considered Ahrens's reasonable expectations of coverage. In *The Medical Protective Co. v. Watkins,* 198 F.3d 100 (3d Cir.1999), we explained that under Pennsylvania law the insured's reasonable expectations of coverage determines the extent of coverage. *Id.* at 106 (citing *Collister v. Nationwide Life Ins. Co.,* 479 Pa. 579, 388 A.2d 1346 (1978)). We noted that "the language of the insurance policy will provide the best indication of the content of the parties' reasonable expectations," but that "[c]ourts ... must examine the totality of the insurance transactions involved to ascertain the reasonable expectations of the insured." *Id.* (internal quotation marks omitted).

The clients suggest that certain questions and answers on Ahrens's insurance application—indicating that his practice did not include securities or bond matters, or any business other than the practice of law, and that he did not represent clients with respect to the sale or issuance of debt or equity securities—mean that he reasonably expected that Exclusion 13 would not apply to him. We disagree. The fact that MLM asked whether Ahrens did securities and bond work or whether he assisted his clients' sales of debt and equities in one section does not change the meaning of the phrase "solicitation or sale of specific securities or specific investments *by [Ahrens ]*" in another section. Nor does the fact that Ahrens denied undertaking anything but the practice of law mean that he could reasonably expect to be covered when he solicited investments; the plain language

constitutes a specific investment regardless of whether it is used to pay wages or buy equipment.

**4.** More recently, the Supreme Court of the United States reiterated that, to determine whether a particular scheme is an investment contract for securities regulation purposes, "[w]e look to whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." ' *SEC v. Edwards,* 540 U.S. 389, 393, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004) (quoting *SEC v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)). Here, where the clients contributed their money to a common enterprise—Madeira and Healy's scheme—with the expectation of profits from Healy's investing acumen, we think it likely that this test would be satisfied as well.

of Exclusion 13 indicates just the opposite. In sum, there is nothing to suggest that Ahrens' reasonable expectation of coverage was other than that articulated in the policy.

For the reasons stated, the District Court did not err in finding that the clients' claims arose out of the solicitation. of specific *investments* and were excluded by Exclusion 13 of the policy.

## C

The clients also argue that, even if the transactions were investments, their claims are not *"arising out of* the solicitation or sale of ... specific investments" because they are based on other alleged acts by Ahrens. For instance, Ricker alleged that Ahrens was negligent in investigating and securing a mortgage to secure Ricker's investment because Ahrens prepared and provided Ricker with what was purportedly a first mortgage on property owned by Madeira, when in fact the property was already encumbered by other mortgages, some of which were prepared by Ahrens himself. Other clients' claims allege breach of fiduciary duty in failing to investigate the Madeira–Healy investment opportunity and legal malpractice in preparing and notarizing notes or other documents effectuating and memorializing their transactions. Like the District Court, we conclude that all of these claims arose out of Ahrens's solicitation of the Madeira–Healy investment opportunity.

Under Pennsylvania law, the phrase "arising out of" in an insurance policy exclusion is not ambiguous and indicates "but for" causation or a "cause and result" relationship. *Madison Constr.,* 735 A.2d at 109–10 (citing *McCabe v. Old Republic Ins. Co.,* 425 Pa. 221, 228 A.2d 901, 903 (1967)). In *Madison Construction,* for example, the Supreme Court of Pennsylvania found that an exclusion for bodily injury "arising out

of" the discharge of pollutants excluded claims by a worker who alleged that he was injured when he fell in a hole upon being overcome by fumes, even though the worker's complaint included claims for negligence in maintaining the construction site, failing to warn of the danger, failing to provide protective gear, failing to detect the dangerous condition, and failing to cover the hole into which he fell. *Id.*

■ Here, as they did below, the clients point to cases supposedly limiting the broad sweep of "but for" causation in the phrase "arising out of." But as the District Court explained, those cases are inapposite because they involved particular claims against insured parties for failing to prevent the acts of third parties alleged to have injured the plaintiffs, whereas here, as in *Madison Construction,* all of the alleged negligence was committed by the insured party, Ahrens. *See Bd. of Pub. Educ. v. Nat'l Union Fire Ins. Co.,* 709 A.2d 910, 916 (Pa.Super.1998), *allocatur denied,* 556 Pa. 669, 727 A.2d 126 (1998) (en banc) (holding that a school district's insurer had a duty to defend the school district against negligent supervision claims, when the president of the PTA organization allegedly molested a student, despite an exclusion for claims arising out of assault, battery, or personal injury, because the "president's acts 'arose out of' the failings of the School District, not the other way around"); *Coregis Ins. Co. v. City of Harrisburg,* No. 03–920, 2005 WL 2179734 (M.D.Pa. Sept. 9, 2005) (holding that a county's insurer had a duty to defend the county against claims that it was negligent in training and supervising employees, when the employees intentionally violated a criminal defendant's civil rights, even though the employees' intentional acts were excluded from coverage under the policy). Because Ahrens's alleged breaches of fiduciary duty and malpractice

were the result of his own solicitation of the investments, and would not have occurred but for that solicitation, they all "arise out of" it.

The clients also argue that the concept of "but for" causation can be limited on proximity grounds, but the cases they cite do not justify importing proximate cause into the "arising out of" analysis. *See U.S. Underwriters Ins. Co. v. Liberty Mut. Ins. Co.*, 80 F.3d 90, 94 (3d Cir.1996) (holding that a driver who was injured by slipping on grease when he exited a car was not maintaining or using the car when he slipped, and therefore his injuries were not "arising out of the maintenance or use of a motor vehicle" under the Pennsylvania Motor Vehicle Financial Responsibility Law, 75 Pa.C.S.A. § 1720). Although "not every incidental factor that arguably contributes to an incident is a but for' cause in the legal sense," in the present case the clients have alleged that, far from being "incidental," Ahrens's solicitation of the investment opportunity caused their losses. *See id.*

Therefore, the District Court did not err in finding that the clients' claims *arose out of* the solicitation of specific investments and were excluded by Exclusion 13 of the policy.[5]

### IV

For the foregoing reasons, we will affirm the orders of the District Court

granting MLM judgment on the pleadings and denying the Wagner Appellants' motion for reconsideration.

---

5. Although they did not advance the argument below, the clients now claim that Exclusion 13 is ambiguous, so the District Court should have considered extrinsic evidence to determine its meaning. We disagree. The clients themselves moved for a judgment on the pleadings as a matter of law, stating correctly that "an insurer's duty to defend must be determined solely by reviewing the pleadings in the underlying action and the insurance policy at issue." Because none of the terms in Exclusion 13 was ambiguous when applied to the facts alleged in the clients' complaints, it would have been improper for the District Court to consider extrinsic evidence of their meanings. *See Madison Constr.*, 735 A.2d at 106 ("[C]ontractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts."); *Niagara Fire Ins. Co. v. Pepicelli, Pepicelli, Watts & Youngs, P.C.*, 821 F.2d 216, 220 (3d Cir.1987) ("Where … the language of the contract is clear and unambiguous, a court is required to give effect to that language." (citing *Pa. Manufacturers' Ass'n Ins. Co. v. Aetna Cas. & Sur. Ins. Co.*, 426 Pa. 453, 233 A.2d 548 (1967))).