**MENDOTA INSURANCE COMPANY,**
Respondent,

v.

**Olivia WARE, by and through
her Uncle and Next Friend,
Jackson Ware, Appellant.**

No. WD 72766.

Missouri Court of Appeals,
Western District.

May 24, 2011.

Stephen R. Bough and Matthew B. Heath, Kansas City, MO, for appellant.

Ellen J. Brooke, St. Louis, MO, for respondent.

Before: GARY D. WITT, P.J., and JAMES E. WELSH and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Olivia Ware, by and through her uncle and next friend, Jackson Ware, appeals the circuit court's grant of summary judgment to respondent Mendota Insurance Company in this declaratory judgment action concerning the interpretation of an automobile insurance policy issued by Mendota. Ware previously obtained a wrongful-death judgment awarding her $175,000 in damages against Mendota's insured. Although Ware's wrongful-death judgment is covered by the Policy, the parties dispute the amount of the Policy's limits of liability for bodily injury coverage. Ware argues that, because of an ambiguity, the Policy must be construed against Mendota to provide bodily injury coverage without any monetary limit. The trial court agreed with Mendota that the limit of liability for injury or death sustained by any one person is $25,000. We affirm.

## Factual Background

On March 27, 2007, Edward Washington, Ware's father, was a passenger in a vehicle owned and operated by Charles Johnson. Johnson's vehicle was involved in an accident with another vehicle. Washington later died as a result of injuries he sustained in the accident.

Ware filed a wrongful-death lawsuit against Johnson to recover damages for Washington's death. Following a bench trial limited to damages, the circuit court entered a judgment against Johnson for $175,000 in compensatory damages.

Mendota had issued an automobile insurance policy to Johnson on January 16, 2007, which was in force on the date of the accident. Ware demanded that Mendota pay the judgment against Johnson. Mendota refused to pay more than $25,000, which it contended was the Policy's per-person limit of liability for bodily injury claims. Ware argued to the contrary that, due to a typographical error in the Policy's Declarations, the Policy was ambiguous and should be interpreted as having no effective limits of liability. Ware therefore contended that Mendota was contractually bound to satisfy the entirety of her judgment against Johnson.

On November 28, 2008, Mendota filed this declaratory judgment action, asking the circuit court to determine that the Policy was unambiguous, and that its limit of liability for bodily injury claims is $25,000 per person. Both Mendota and Ware filed motions for summary judgment. On June 30, 2010, the trial court granted Mendota's motion and denied Ware's, finding that the limit of liability for Washington's death is $25,000. This appeal follows.

## Standard of Review

■ Appellate review of the grant of summary judgment is *de novo*. The Court reviews the record in the light most favorable to the party against whom summary judgment was entered.

"The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially." "Summary judgment will be upheld on appeal if: (1) there is no genuine dispute of material fact, and (2) the movant is entitled to judgment as a matter of law."

*Kinnaman–Carson v. Westport Ins. Corp.,* 283 S.W.3d 761, 764–65 (Mo. banc 2009) (citations omitted). In addition, "[t]he interpretation of an insurance policy, and the determination whether coverage and exclusion provisions are ambiguous, are questions of law that this Court reviews *de novo*." *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010).

## Analysis

Ware argues that a single-character typographical error on the Policy's Declarations page creates an ambiguity in the Policy, requiring that it be interpreted in her favor as imposing *no* monetary limit on the liability coverage Johnson purchased from Mendota. We begin by setting forth the relevant policy provisions.

The Declarations of Johnson's personal automobile insurance policy state in relevant part:

The coverages you have selected are shown by premium entries.
The coverage provided is subject to all the terms of this policy.

| | | | Unit 1 |
|---|---|---|---|
| A. Bodily Injury | Each Person | $25,000 | 94.00 |
| | Each Accident | $50,000 | |
| A. Property Damage | Each Accident | $10,000 | 86.00 |
| D. Uninsured Motorist | Each Person | $25,000 | 36.00 |
| | Each Accident | $50,000 | |

| | |
|---|---|
| Total full term premium | 216.00 |

(Emphasis added.)

All parties recognize that, because the Policy's other provisions designate the property damage coverage as "Coverage B," the letter "A" next to the words "Property Damage" should have been a "B." It is this mistake on which Ware relies to argue that Johnson purchased unlimited bodily injury liability coverage (for a $94.00 bi-annual premium).

The Automobile Policy Booklet for the Policy begins with the following language, under the heading "Agreement":

In return for payment of the premium and subject to all the terms of this policy, we will provide the coverages you have selected. These are shown by premium entries in the Declarations. The Declarations is a part of this policy.

The Automobile Policy Booklet contains separate parts governing coverage for liability, medical payments, uninsured motorists, and damage to the insured's vehicle. Only the Policy's liability coverage is at issue in this appeal. The liability coverage part begins with an "Insuring Agreement," which states in its entirety:

We will pay damages for "bodily injury" (Coverage A) or "property damage" (Coverage B) for which any "insured" becomes legally responsible because of an auto accident. We will settle or defend, as we consider appropriate, any claim or suit asking for these damages. In addition to our limit of liability, we will pay all defense costs we incur. Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted. We have no duty to defend any suit or settle any claim for "bodily injury" or "property damage" not covered under this policy.

The Policy contains the following provision explaining the operation of the limits of liability:

LIMIT OF LIABILITY

## B.[1]  Split Liability Limits

If the Declarations show separate limits of liability for Coverage A and Coverage B, the limit of liability shown in the Declarations for each person for Coverage A is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of "bodily injury" sustained by any one person in any one auto accident. Subject to this limit for each person, the limit of liability shown in the Declarations for each accident for Coverage A is our maximum limit of liability for all damages for "bodily injury" resulting from any one auto accident. The limit of liability shown in the Declarations for each accident for Coverage B is our maximum limit of liability for all "property damage" resulting from any one auto accident. These limits are the most we will pay regardless of the number of:

1. "Insureds";

2. Claims made;

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the auto accident.

## I.

We first consider whether the mistyped letter "A" creates an ambiguity in the Policy. In her briefing, Ware refers to the capitalized letter "A," which appears next to the words "Property Damage" on the Declarations page, as an "error," an "admitted error," and a "blatant error."

Despite her acknowledgment that the second letter "A" is an obvious mistake, Ware contends that this single-character typographical error creates an ambiguity, because "[a]n average lay person would have found it impossible to apply the [Policy's] limits of liability due to the absence of 'Coverage B' from the Declarations Page." We disagree.

As the Missouri Supreme Court has recently explained,

"An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is *reasonably open to different constructions.*"

*Burns v. Smith,* 303 S.W.3d 505, 509 (Mo. banc 2010) (emphasis added; quoting *Seeck v. Geico Gen. Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007)). An insured is entitled to a pro-coverage interpretation of an insurance policy " 'if the terms are *susceptible of two possible interpretations* and there is room for construction.' " *Id.* at 512 (emphasis added; citation omitted); *see also id.* at 513 n. 7 (emphasizing that the reading of the relevant policy provision advocated by the insured, which the Court adopted, was "a reasonable interpretation" "supported by reference to common grammar texts").

In this case, and despite the "blatant" typographical error on the Declarations page, the Policy cannot reasonably be construed to impose *no* monetary limit on Johnson's liability coverage, or to impose any limit on Johnson's per-person bodily

1.  The "Limit of Liability" section in the Automobile Policy Booklet contains a Paragraph "A" governing policies with a "single limit of liability for Coverage A and Coverage B combined." Paragraph "A" was eliminated, however, by the Policy's Missouri Specialty Automobile Amendatory Endorsement. (The Insuring Agreement we have quoted also comes from this Missouri-specific endorsement.) Because the Policy, as amended by the Missouri Specialty Automobile Amendatory Endorsement, contains only a single limit of liability option, the clarity of the "Limit of Liability" section would arguably have been enhanced if the endorsement had also deleted heading "B," and the text of the first sentence of paragraph "B" through the first comma.

injury coverage *other than* the $25,000 specified in the Policy's Declarations.

It would be obvious to any reasonable reader of the Policy—as Ware herself tacitly acknowledges—that the second letter "A" appearing on the Declarations page is erroneous. The "Insuring Agreement" for liability coverage is the central provision which actually imposes an indemnity obligation on Mendota, and is the first section of the Policy's liability coverage part. The Insuring Agreement's first sentence plainly identifies two different liability coverages when it promises that "[w]e will pay damages for *'bodily injury'* (*Coverage A*) or *'property damage'* (*Coverage B*) for which any 'insured' becomes legally responsible because of an auto accident." (Emphasis added.) Consistent with the definitions of "Coverage A" and "Coverage B" in the Insuring Agreement, the Declarations identify two separate liability "coverages" which Johnson had selected, one for "Bodily Injury" and one for "Property Damage." It further specifies different limits of liability, and separate premium payments, for the "Bodily Injury" and "Property Damage" coverages. Based on the definition of "Coverage A" and "Coverage B" in the first sentence of the Insuring Agreement, a reasonable reader would recognize that the letter "A" next to "Property Damage" on the Declarations page was a typographical error, and should be the letter "B."

The Policy's "Limit of Liability" provision confirms this outcome. The Policy, as amended by the Missouri-specific endorsement, *see supra* note 1, contains only a "Split Liability Limits" option under the heading "Limit of Liability." That "Split Liability Limits" option applies where "the Declarations show separate limits of liability for Coverage A and Coverage B." A reasonable reader of the Policy would know, from the first sentence of the Insuring Agreement, that "Coverage A" refers to "bodily injury" coverage, and that "Coverage B" refers to "property damage." Consistent with the definition of "Split Liability Limits," the Declarations page in fact identifies "Bodily Injury" and "Property Damage" as separate "coverages" which Johnson had selected, and clearly specifies separate limits of liability for each.[2] The definition of the "Split Liability Limits" option provides an additional basis for concluding that any reasonable reader would recognize that the "Property Damage" coverage on the Declarations page should have been identified by the letter "B," *not* the letter "A."

With respect to "bodily injury" coverage, the "Limit of Liability" provision states that

> the limit of liability shown in the Declarations for each person for coverage A is our maximum limit of liability for all damages ... arising out of "bodily injury" sustained by any one person in any one auto accident. Subject to this limit for each person, the limit of liability shown in the Declarations for each accident for Coverage A is our maximum limit of liability for all damages for "bodily injury" resulting from any one auto accident.

For "property damage" coverage, the "Limit of Liability" provision specified that "[t]he limit of liability shown in the Declarations for each accident for Coverage B is our maximum limit of liability for all 'prop-

**2.** The Declarations page does not explicitly identify the dollar amounts listed next to particular coverages as limits of liability for those coverages (as could have been accomplished by a column heading). However, Ware acknowledges that, but for the mis-typed letter "A," the Policy would not be ambiguous concerning the applicable limits of liability, tacitly admitting that the meaning of the dollar figures is self-evident.

erty damage' resulting from any one auto accident." The quoted language reinforces, yet again, that "Coverage A" is "bodily injury" coverage, and that "Coverage B" is for "property damage." It also specifies that "Coverage A" has both "each person" and "each accident" limits, while "Coverage B" has only an "each accident" limit. The Declarations page conforms to this description (but for the mis-typed letter "A"). Finally, the quoted language explains in straightforward terms how the limits of liability will operate.

Thus the relevant provisions of the Policy mesh together seamlessly, and point to only one reasonable conclusion as to the letter "A" appearing next to the words "Property Damage" on the Declarations page: it is a "blatant error," as Ware herself acknowledges. That "blatant error" cannot create an ambiguity, however, because it is not "reasonably open to different constructions," or "susceptible of two possible interpretations." *Burns,* 303 S.W.3d at 509, 512.

Caselaw from other jurisdictions supports this conclusion. For example, in *Prudential Property & Casualty Insurance Co. v. Raymond,* 138 N.H. 17, 634 A.2d 1015 (1993), an insurance policy's declarations page listed, by number, the endorsements incorporated into the policy. *Id.* at 1016. The declarations listed endorsements "903" and "2219A" without a space between them, resulting in an ostensible reference to non-existent endorsement "9032219A." *Id.* at 1016–17. The insured argued—like Ware here—that this typographical error created an ambiguity as to whether endorsement 2219A was incorporated into the policy, and that this ambiguity had to be construed against the insurer. The court disagreed. While it recognized that under New Hampshire law (as in Missouri), ambiguities are construed in favor of the insured, the court empha-

sized that "[l]anguage is ambiguous, however, only if 'the contracting parties reasonably differ as to its meaning.'" *Id.* at 1017 (citation omitted). Under this principle, the court held that the obvious typographical error on the policy's declarations page could not constitute an ambiguity:

A person looking for "9032219A" could not avoid noticing that a PAC "903," but not a "9032219A," exists[, and is listed in the table of contents of the endorsement booklet]. It is but a very small intellectual step to wonder if a "2219A" might be found. The layout of the table of contents makes it difficult to overlook the entry "2219A[,]" [the last listed endorsement]. The eye is virtually drawn to it. We find it hard to believe that a policy holder wishing to discover the significance of "9032219A" would turn to the endorsement booklet's table of contents and not conclude that a simple typographical error had been made on the declarations page. Although we must view the parties' policy from the perspective of a lay person of average intelligence, it would be a sad indictment of our populace to assume that such a person, undertaking a "more than casual reading of the policy," could not figure out that the anti-stacking provision applies here.

*Id.* (citations omitted).

Other cases reach the same conclusion: a typographical error in an insurance policy does not create an ambiguity where the error, and the policy's intended meaning, would be apparent to an ordinary reader. *See Behrens v. City of New York,* 279 A.D.2d 407, 720 N.Y.S.2d 64, 65 (2001) (despite "the insurer's typographical error in referring in the subject endorsement to exclusion 'J' instead of 'E,'" finding no ambiguity where "the exclusionary import of the endorsement is clear and, indeed, 'susceptible of only one interpretation'"

(citation omitted)); *Smith v. Cont'l Cas. Co.*, 128 Wash.2d 73, 904 P.2d 749, 753 (1995) (reversing Court of Appeals' finding of ambiguity in insurance policy based on "an apparent typographical error," and emphasizing that it "does not necessarily follow" that the existence of such an error renders a policy ambiguous); *Kennedy v. Hosp. Serv. Corp.*, 118 Ill.App.3d 584, 74 Ill.Dec. 176, 455 N.E.2d 206, 208 (1983) (although cross-reference in health insurance policy's benefits section "contains a clerical error," finding no ambiguity where mis-referenced section "obviously has nothing to do with the duration of benefits").

The Policy was not ambiguous. The rule that ambiguities be construed in favor of the insured has no application here.[3]

## II.

█ Ware would not be entitled to prevail even if the Policy were construed to be ambiguous. In the words of a decision she quotes, where a policy is ambiguous it must be construed in favor of the insured, "to the end that coverage is afforded 'to the full extent that *any fair interpretation* will allow.'" *Crossman v. Yacubovich*, 290 S.W.3d 775, 781 (Mo.App. E.D.2009) (emphasis added; citation omitted). "Where 'there is ambiguity, insureds are entitled to a resolution of that ambiguity consistent with their *objective* and *reasonable* expectations as to what coverage would be provided.'" *Burns*, 303 S.W.3d at 512 (citation omitted). "[N]ot every

ambiguity in an insurance policy is resolved favorably to the insured, but only where a reasonable person in the position of the adherent would have expected coverage." *Estrin Constr. Co. v. Aetna Cas. & Sur. Co.*, 612 S.W.2d 413, 420 (Mo.App. W.D.1981). As explained in a leading treatise:

A fair and lawful interpretation is required even when the doubts are to be resolved in favor of the insured. The rule of favorable construction for the insured should not be applied so as to ... permit a construction which is unreasonable and not in keeping with the language used and the obvious intent of the parties.

2 COUCH ON INSURANCE 3d § 22:17, at 22–94 to 22–95 (2010).

Here, Ware's suggestion that the Policy be read to impose *no* liability limits is inconsistent with "'*objective* and *reasonable* expectations as to what coverage would be provided,'" *Burns*, 303 S.W.3d at 512 (citation omitted), and goes well beyond what "any fair interpretation [of the Policy] will allow." *Crossman*, 290 S.W.3d at 781 (citation and internal quotation marks omitted).

█ "[I]n determining the meaning of the words and phrases of an insurance policy, the court will not isolate ambiguous phrases, but will read the policy as a whole giving every clause some meaning if it is reasonably able to do so." *Miller v. O'Brien*, 168 S.W.3d 109, 116 (Mo.App. W.D.2005) (citation and internal quotation

**3.** Ware argues that the trial court in fact *found* an ambiguity. The circuit court's Order and Judgment, however, merely notes a potential ambiguity with respect to the Policy's *property damage* coverage, which is not at issue here. Any ambiguity concerning the limits of liability for property damage coverage would not be relevant here, given that Ware's claim involves only the Policy's bodily injury coverage. *See* 2 COUCH ON INSURANCE 3d

§ 21:14, at 21–56 to 21–57 (2010) ("The fact ... that terms of a policy of insurance may be ambiguous where applied to one set of facts does not make them ambiguous as to other facts which come directly within the purview of such terms."). In any event, the correct interpretation of the property damage limits of liability would be apparent to a reasonable insured, for reasons we have explained in the text.

marks omitted). Ware's proposed reading of the Policy violates this principle. References to finite, monetary limits of liability pervade the Policy. By arguing that the Policy contains no such limits, Ware's arguments would cloud the meaning of multiple provisions of the Policy, and render others wholly meaningless or ineffective. Thus, under Ware's reading the dollar amounts listed on the Declarations page, next to the particular coverages which Johnson had selected, would have no meaning or effect whatsoever. The same could be said of the provisions specifying that Mendota would pay defense costs, and certain supplementary expenses, "[i]n addition to our limit of liability," and that its obligation to defend or settle claims terminates "when our limit of liability for this coverage has been exhausted."

Ware's argument would also make it impossible to apply the "Other Insurance" section of the liability coverage part, which provides that,

> [i]f there is other applicable liability insurance we will pay only our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits.

Obviously, unless the Policy *has* limits of liability, it is impossible to determine the proportion of those limits to the limits of other applicable policies. Finally, Ware's argument would render meaningless the provision of the Policy providing that, if an accident occurs outside Missouri, and the jurisdiction in which the accident occurs has "[a] financial responsibility or similar law specifying limits of liability for 'bodily injury' or 'property damage' higher than *the limit shown in the Declarations,* your policy will provide the higher specified limit." (Emphasis added.)

Because Ware's reading of the Policy would do violence to multiple, material policy terms, and is inconsistent with an in-sured's " '*objective* and *reasonable* expectations,' " *Burns,* 303 S.W.3d at 512 (citation omitted), we would reject her proposed interpretation even if we agreed that an ambiguity existed.

## Conclusion

The circuit court's judgment, which declared that the Policy's limit of liability for the death of Edward Washington is $25,000, is affirmed.

All concur.