The BAR PLAN MUTUAL
INSURANCE COMPANY,
Plaintiff/Respondent,

v.

CHESTERFIELD MANAGEMENT AS-
SOCIATES, d/b/a Peachtree Property
Investments, L.P., Defendant,

and

Sauerwein, Simon, and Blanchard,
PC, Defendant/Respondent,

and

Michael D. Kim, Defendant/Appellant.

No. ED 98826.

Missouri Court of Appeals,
Eastern District,
Division One.

April 23, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 23, 2013.

Application for Transfer Denied Oct. 1, 2013.

John S. Sandberg, St. Louis, MO, for appellant.

Brent Baldwin, St. Louis, MO, John Gianoulakis, Clayton, MO, for respondent.

CLIFFORD H. AHRENS, Presiding Judge.

Michael Kime appeals the trial court's final judgment on its separate orders granting partial summary judgment in favor of The Bar Plan Mutual Insurance Company ("The Bar Plan") and the order sustaining Sauerwein, Simon & Blanchard's ("SSB") motion to quash his notice of deposition and subpoena. Finding no error, we affirm.

## Background

In 2004 Kime was an attorney employed by the law firm of SSB, and represented Chesterfield Management Associates ("CMA") in an $11 million real estate deal. Kime made one or more errors that contributed in the sale of the real property failing to close, and thereafter the value of the real property declined precipitously. In February 2009, CMA notified Kime and SSB that it intended to file suit against them for the handling of the failed transaction.

At that time SSB, and its employee, Kime, were insured against legal malpractice by The Bar Plan. That insurance policy ("2008 Policy") had effective dates of July 15, 2008 to July 15, 2009. The 2008 Policy had a limit of $250,000 per claim. Thereafter, The Bar Plan issued a sequential policy covering SSB and its employees with effective dates of July 15, 2009 to July 15, 2010 ("2009 Policy"). Midway through the 2009 Policy coverage period, SSB increased the policy limits, but the 2009 Policy retained a limit of $250,000 for

claims arising out of acts or omissions that occurred prior to the policy increase. Both policies were claims-made-and-reported ("claims made") policies rather than occurrence policies and contained an identical Multiple Insured, Claims and Claimants Provision ("MICC") that provided, in part, that:

> The demand for money or services by more than one person or Entity shall not operate to increase the Company's liability. Two or more demands arising out of a single act or omission or a series of related acts or omissions shall be treated as a single Claim. Any such claim, whenever made, shall be considered for the purposes of this insurance to have been first made and reported during the Policy Period, Automatic Extended Claim Reporting Period, Optional Extension Period, or Non–Practicing Extension Period in which the earliest demand arising out of such act or omission was first made, provided that such demand is, in fact, asserted against an Insured and reported to the Company during a period in which the Company provided coverage. All such demands shall be considered a single Claim subject to a single Limit of Liability, regardless of the number of Insureds against which the demands are made.

On December 22, 2009, Fred Sauerwein, SSB's insured designee, told The Bar Plan to offer the $250,000 policy limit of the 2008 Policy to CMA for a complete release of SSB and its attorneys, including Kime. CMA filed a three-count malpractice suit ("malpractice action") against Kime and SSB on January 7, 2010, alleging one count for breach of contract and two separate counts for different acts of negligence.

The Bar Plan provided Kime and SSB with an unconditional defense. CMA also sent a demand letter to SSB and Kime for $316,000.[1] The Bar Plan, per Sauerwein's instructions, offered the 2008 Policy limit of $250,000 for a complete settlement and release of all CMA's claims and causes of action, and dismissal of the malpractice action with prejudice. Negotiations ensued, largely via e-mail. On February 25, 2010, The Bar Plan restated via e-mail to CMA's counsel that it was offering a one-time payment of $250,000 to settle all of CMA's claims and causes of action in return for a complete release. CMA's counsel replied later that same date that "both claims outlined in my letters and the suit papers are settled for $250,000." CMA's counsel also acknowledged that The Bar Plan had stated that there was only one limit of $250,000 available for CMA's asserted claims, and that he was not disputing that position. The Bar Plan replied, stating "Thank you for that clarification." Within three hours, however, CMA's attorney sent an e-mail with a copy of its First Amended Petition to The Bar Plan that added a fourth count to the malpractice action ("Count IV") against SSB and Kime that alleged a breach of fiduciary duty by SSB and Kime for failing to disclose that the malpractice insurance coverage for the $11,000,000 real property transaction was only $250,000. The e-mail stated, in part, that:

> Enclosed please find plaintiff's First Amended Petition. There is only one change in it—there is now a Count Four which is a new claim. The three earlier counts are settled per our exchange of emails today and earlier.
>
> . . .

---

1. CMA's counsel initially treated the subject matter of Counts I–III of the malpractice action as two separate claims against the 2008 Policy, and made a settlement demand of $250,000 for what it considered to be one claim, and an additional $66,000 for what it thought to be a separate second claim under the 2008 Policy.

I realize that your policy covers claims made and reported in the 7/15/08 to 7/15/09 period and this new claim in Count Four is not made and reported in that period. If you continued as the Firm's insurer in the current year you can let me know. If the Firm has a new insurer Mr. Sauerwein can report this new claim to it.

Turning to finalize the settlement of the claims you are covering I think the easiest way is for me to dismiss the three counts with prejudice. If you want to revise your release to limit it to those claims send me your proposed revisions.

. . .

The Bar Plan replied that the consent to settle CMA's claims and causes of action was limited to a settlement for the policy limit of $250,000 for "all of such claims and causes of action, no matter the theory asserted or damage claimed." CMA's counsel and The Bar Plan exchanged further e-mails, with The Bar Plan asserting that CMA failed to accept the settlement offer of February 19, 2010, but rather had tried to make "a qualified acceptance with additional demands, which is no acceptance at all." Mr. Sauerwein, as SSB's Insured Designee, was carbon copied on the above-mentioned settlement negotiations. No demand or instruction was made to The Bar Plan that it pay the 2008 Policy limit of $250,000 to settle Counts I through III, and to leave Count IV open, or use the 2009 Policy coverage limits to settle Count IV.

The Bar Plan continued to defend SSB and Kime, and succeeded in getting the trial court on June 24, 2010, to order the dismissal of Count IV on the basis that it failed to state a claim for which the trial court could grant relief. Thereafter CMA, The Bar Plan, SSB, and Kime attempted to mediate the malpractice action. The Bar Plan again offered to pay the 2008 Policy limit of $250,000 to settle all claims and causes of action, and CMA refused. SSB, Kime, and CMA entered into a separate agreement ("mediation agreement") that excluded The Bar Plan in which CMA agreed to satisfy any judgment that it obtained only from The Bar Plan, and they stipulated to Kime's liability to CMA on Counts I, II, and III. Kime and SSB agreed to permit a consent judgment against Kime on Counts I, II, and III, and agreed to cooperate with CMA. Regarding Count IV of the First Amended Petition, they agreed that after Count IV was reinstated, CMA would make a settlement demand on the 2009 Policy within the limits of that policy and Kime and SSB would consent to settle the demand. They further agreed that if The Bar Plan would not settle the claim on Count IV, that CMA would agree to deal with that claim as it had with Counts I–III. Kime and SSB further agreed to assign any causes of action that they might have against The Bar Plan to CMA.

Thereafter The Bar Plan withdrew its defense of Kime and SSB based on the mediation agreement. On March 22, 2011, CMA made its demand on The Bar Plan to settle Count IV for the $250,000 limit of the 2009 Policy. The Bar Plan rejected this demand, stating that the 2009 Policy did not cover any of the malpractice action, neither Counts 1–III nor Count IV.

Meanwhile, The Bar Plan filed the present declaratory judgment action on February 4, 2011. In its petition, The Bar Plan asked the trial court to declare that the malpractice action was one claim under the 2008 Policy, and accordingly that the 2009 Policy did not cover any of the counts of the malpractice action. It also asked for a declaration that it had no duty to indemnify SSB, Kime, CMA, or any assignees on any portion of the judgment that CMA might obtain in the malpractice action be-

cause SSB and Kime settled that case without The Bar Plan's consent in a manner that was prejudicial to The Bar Plan, which breached their contractual duty to The Bar Plan. The Bar Plan filed a motion for summary judgment. On August 5, 2011, the trial court granted partial summary judgment in favor of The Bar Plan, finding that the allegations in Counts I through IV of the malpractice action "constitute one claim under the 2008 [P]olicy[,]" and that the 2009 Policy did not cover Count IV of CMA's petition in its malpractice action against SSB and Kime.

Thereafter, on August 19, 2011, Kime filed a counterclaim, subsequently amended on August 29, 2011. In his amended counterclaim, Kime asserted two counts ("Counterclaim I" and "Counterclaim II"). Counterclaim I alleged that The Bar Plan acted in bad faith in refusing to settle Counts I through III of the malpractice action for the mishandling of the real estate transaction under the 2008 Policy limits of $250,000. Counterclaim II alleged that The Bar Plan acted in bad faith in refusing to settle Count IV of the malpractice action under the 2009 Policy limits of $250,000. Kime alleged in both counts that The Bar Plan breached its fiduciary duty to him and acted to protect its own interests at his expense. The Bar Plan filed an answer to these counterclaims and raised several affirmative defenses to them. Several months later, The Bar Plan filed a motion for summary judgment on Counterclaim I. While the trial court was considering this motion, with competing memoranda and additional statements of fact filed by Kime and The Bar Plan, SSB filed a motion to quash a subpoena issued by CMA's counsel directed towards Thom-

as Plunkert and the law firm of Leritz, Plunkert, & Bruning, P.C., which jointly represented SSB and Kime in the malpractice action. The subpoena requested the "entire file in connection with the representation of Michael Kime and [SSB] and/or Bill Sauerwein" regarding the malpractice action. The trial court granted the motion to quash the subpoena.

On July 11, 2012, the trial court granted The Bar Plan's motion for summary judgment on Counterclaim I "[f]or the reasons stated in The Bar Plan's Motion for Summary Judgment, and the papers filed in support thereof[.]" The Bar Plan subsequently dismissed without prejudice the remaining claims in its petition for declaratory judgment, whereupon the trial court issued its final judgment that disposed of all remaining claims.[2]

Kime now appeals from the trial court's judgment on its orders granting partial summary judgment in favor of The Bar Plan on its declaratory judgment action and on Counterclaim I. Kime also alleges that the trial court erred in granting the motion to quash the subpoenas directed to Plunkert and to Plunkert's law firm.

## Standard of Review

 Our review of a summary judgment is essentially de novo. *ITT Commercial Finance v. Mid–America Marine*, 854 S.W.2d 371, 376 (Mo. banc 1993). This Court reviews the record in the light most favorable to the party against whom judgment was entered and accords that party the benefit of all reasonable inferences that may be drawn from the record. *Id.* "Facts that are set forth by affidavit or

---

**2.** Because The Bar Plan dismissed the remaining claims in its petition for declaratory judgment without prejudice, the issue of whether The Bar Plan has any liability or duty to indemnify under the 2008 Policy has not

been addressed by the trial court, and is not an issue on appeal. At oral argument, counsel for The Bar Plan stated it was still willing to settle for the policy limits of the 2008 Policy.

otherwise in support of a party's motion for summary judgment are taken as true unless contradicted by the non-moving party's response to the motion." *Id.*

## Discussion

### I. Coverage of 2009 Policy

To facilitate analysis, we initially will examine Kime's second point relied on. Kime contends that the trial court erred in granting summary judgment in favor of The Bar Plan and holding that the 2009 Policy did not cover Count IV of the malpractice action, the failure to disclose low insurance coverage, "because as a matter of law coverage existed in the first instance and there was no exclusion or other provision directing a 'look back' to a previous policy of allowing [The] Bar Plan to disregard the claim, in that the claim was first made and reported during the policy period of the 2009 Policy and nothing in that policy negated the claim."

Both the 2008 Policy and 2009 Policy are "claims made" policies. A "claims made" policy provides insurance coverage for claims that first arise during the time period of the policy, even though the event may have occurred at a previous time. *Todd v. Missouri United School Insurance Council* 223 S.W.3d 156, 160 n. 2 (Mo. banc 2007). "Claims made" policies are designed to limited liability to a fixed period of time, and allowing coverage beyond that period would give the insured more coverage than the insured bargained and paid for, and would require the insurer to provide coverage for risks not assumed. *See A.C. Strip v. Home Insurance Company,* 868 F.2d 181, 187 (6th Cir.1989). Both the 2008 Policy and 2009 Policy have a "Limits of Liability" section that includes a MICC subsection as set forth previously. The MICC subsection is followed by an explicitly-stated non-exhaustive list of "a series of related acts or omissions that

constitute a *single Claim* under the Policy where a single Limit of Liability will apply[.]" This list includes "[a]ll activities pertaining to a real estate transaction[.]"

Insurance policies are contracts, hence the rules of contract construction apply when examining an insurance policy. *American Family Mutual Insurance Company v. St. Clair,* 295 S.W.3d 586, 591 (Mo.App.2009). The words of a policy are given their plain, ordinary meaning unless it is obvious that a technical meaning was intended. *Id.* Where there is no ambiguity in the contract, courts enforce the policy as written. *Id.* Whether a contract is ambiguous or not is a question of law. *Id.* In determining whether there is ambiguity, the policy must be read as a whole to ascertain the intent of the parties. *Id.* A contract is ambiguous only if reasonable persons may honestly and fairly differ in their construction of the terms because the terms are susceptible to more than one meaning. *Id.* A contract is not ambiguous simply because the parties disagree over its meaning. *Id.* Ambiguous language in an insurance policy is construed against the insurer. *Id.* at 592. However, courts should not choose an interpretation neutralizing a policy provision if another interpretation gives it effect. *Id.*

Counts I through III of the malpractice action, which constituted a single claim under the 2008 Policy, were all related to the acts and omissions of SSB and its attorney, Kime, in handling a real estate transaction for CMA, namely the sale of a property that would have been worth $11 million. Count IV of CMA's First Amended Petition alleged that SSB and Kime had inadequate levels of insurance coverage to handle a transaction of that magnitude. Assuming *arguendo* that this is a valid cause of action against SSB and Kime, The Bar Plan asserts that this claim is part of a

series of related acts involving the real estate transaction at issue. We agree.

Missouri has not specifically addressed the issue of whether the use of the term "related" in a MICC clause in an insurance policy is ambiguous where the term "related" is not specifically defined in the policy. One of the leading cases on this issue is *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.*, 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263 (1993). The language of the MICC clause in that case is extremely similar to that in the 2008 Policy and 2009 Policy. The California Supreme Court extensively discussed the term "related" in the context of a "claims made" insurance policy for legal malpractice. As it noted, "[t]he absence from the policy of the term 'related' does not *by itself* render the term ambiguous[,]" although in some cases it might weigh in favor of finding an ambiguity "when the term in question has no generally accepted meaning outside of the context of the policy itself." *Id.* at 1270. "That court went on to observe that "related" is a word used commonly with a broad meaning that includes a myriad of relationships, and is sufficiently broad to encompass both logical as well as causal relationships." *Id.* at 1271. It went on to hold that "[m]ultiple or broad meanings do not necessarily create ambiguity[,]" and that this was true with the word "related". *Id.* It noted that there is often a deliberate purpose in using a word with a broad meaning or multiple meanings in a contract, namely to achieve a broad purpose. *Id.* The California Supreme Court opined that the appropriate question was whether the word "related" was ambiguous in the context of the specific policy and the circumstances of the particular case. *Id.* It went on to hold that while "related" is a broad word, it is not necessarily ambiguous, and that as used in the policy and in the particular circumstances, it was not ambiguous and encompassed logically related as well as causally related acts. *Id.* at 1274. It noted that the term "related" would not cover every conceivable logical relationship because "[a]t some point, a relationship between two claims might be so attenuated or unusual that an objectively reasonable insured could not have expected they would be treated as a single claim." *Id.* at 1275. It held that there was no attenuation or surprise to the insured in that particular case and policy. *Id.*

The reasoning of the California Supreme Court is sound and applicable in this case. The 2008 Policy and 2009 Policy made an effort to avoid ambiguity by giving a number of non-exhaustive examples of related acts or omissions that would give rise to a single claim. The connection between Counts I through III of the malpractice action and Count IV is not attenuated, but rather closely tied. SSB and Kime could not be liable under Count IV unless there was liability under one of more of the first three counts. There was no additional damage to CMA under Count IV that was separate from that of Counts I through III. Merely because CMA did not make a claim that the insurance coverage regarding SSB's handling of the real estate transaction was inadequate until 2010 does not make the acts or omissions in the malpractice action unrelated so as to constitute a separate claim under the 2009 Policy. The language of the MICC in the Limits of Liability sections of the 2008 Policy and 2009 Policy is not ambiguous because of the use of the word "related."

Kime argues that because the claim in Count IV of the malpractice action was made during the period when the 2009 Policy was in effect, the 2009 Policy must apply, and it does not relate back to the claim made under the 2008 Policy in Counts I–III. He asserts that the MICC clause of the 2009 Policy is inapplicable,

and that the MICC clause of the 2008 Policy does not extend to reach claims made outside of that policy period. We disagree.

The MICC of the 2009 Policy is not restricted to relating back only to acts or omissions in the period from July 15, 2009 to July 15, 2010. It states that any related claim, whenever it is made will relate back to the policy period in which the earliest demand arising out such act or omission was initially made, provided that such demand was asserted against an insured and reported to The Bar Plan during a period in which The Bar Plan provided coverage. The Bar Plan provided coverage to SSB and Kime from July 15, 2008 to July 15, 2009, when the earliest demand based on Counts I through III of the malpractice action was made. If the aggregation of multiple demands or claims into a single claim based on related acts or omissions were to be limited to only the present policy period of the MICC, then the MICC would have superfluous language.

■■■ It is true that ambiguous language in an insurance contract is construed against the insurer, as is limiting language. *St. Clair*, 295 S.W.3d at 592. However, the resolution of such an ambiguity must be consistent with the objective and reasonable expectations as to what coverage would be provided. *Mendota Insurance Compay v. Ware*, 348 S.W.3d 68, 74 (Mo. App.2011). Even when doubts are to be resolved in favor of the insured, there must be a fair and lawful interpretation, and the rule of construction in favor of the insured does not permit a construction that is unreasonable and not in keeping with the language used and the obvious intent of the parties. *Id.* (quoting *2 COUCH ON INSURANCE 3d Section 22:17, at 22–94 to 22–95* (2010)).

Similar MICC provisions have been held to relate back to previous policy years.

For example, in *A.C. Strip v. Home Insurance Company*, 868 F.2d 181, 189 (6th Cir.1989), the MICC provision read as follows:

> Two or more claims arising out of a single act, omission, or personal injury or a series of related acts, errors, omissions or personal injuries shall be treated as a single claim. All such claims, whenever made, shall be considered first made during the policy period or Optional Extension period in which the earliest claim arising out of such act, error, omission or personal injury was first made, and all such claims shall be subject to the same limits of liability.

The plaintiff in that case, the United States, made its first claim against an individual attorney on July 25, 1985. *Id.* at 183, 189–90. It filed its second amended complaint against the law firm on April 15, 1986 adding new claims. *Id.* at 184, 189. The policy at issue ("Home policy") went into effect on August 2, 1985. *Id.* at 183–84, 188–90. The federal district and appellate courts held that the claims against the law firm related back to the claims against the individual attorney, and were not first made for the purposes of coverage during the Home policy period, but rather the policy period of the previous policy by Pacific Employers Insurance Company, which ran from August 2, 1984 to August 2, 1985. *Id.* at 189–90. The appellate court went on to hold that,

> [T]he intent of the provision is to relate subsequent claims, based on an initial claim, back to the initial claim so that the insurer is not liable to the limits of the policy on both claims. The language of the multiple insureds clause is clear and unambiguous.

*Id.* at 190.

The language in the MICC provision of the 2008 Policy and 2009 Policy, notwith-

standing some minor differences between it and that of the Home policy in *A.C. Strip*, is likewise clear and unambiguous. Assuming that failing to have an adequate level of insurance is a valid claim upon which relief can be granted, it is true that this would be a different act or omission from the acts and omissions alleged in Counts I through III of the malpractice action. However, while different, it is an act or omission that is related to the acts and omissions in Counts I–III; Counts I, II, III and IV were all part of the representation of CMA by Kime and SSB in an $11,000,000 real estate transaction. To hold otherwise, namely that there is no relating back a claim to prior claims made outside of the dates of the policy period would be to encourage insureds to try to split claims that were based on the same or related acts or omissions or series of related acts or omissions in order to get coverage from multiple policies and thereby effectively increase the liability limits without increasing the premiums paid. The trial court did not err in granting summary judgment. Point denied.

## II. Bad Faith

▇▇▇ In his first point relied on Kime asserts that the trial court erred in granting summary judgment in favor of The Bar Plan, disregarding his affirmative defenses related to bad faith claims handling, disregarding unchallenged expert testimony that The Bar Plan had acted in bad faith, and holding that Kime had failed to cooperate with The Bar Plan. Kime avers that The Bar Plan failed to satisfy its burden under the applicable standard of review and was not entitled to judgment as a matter of law in that there was a genuine issue of material fact regarding whether The Bar Plan had placed its own financial interests ahead of Kime's. In addition, Kime alleges that The Bar Plan failed to present any evidence to challenge his affirmative defenses and expert testimony, and could not insist on his cooperation after it breached the insurance contract by acting in bad faith.

▇▇▇▇ The Missouri Supreme Court examined the tort of bad faith for failure to settle in the seminal case of *Zumwalt v. Utilities Insurance Co.*, 360 Mo. 362, 228 S.W.2d 750 (1950). It held that "no action will lie against the insurer for the amount of the judgment recovered against the insured in excess of the policy limits, unless the insurer is guilty of fraud or bad faith in refusing to settle a claim within the limits of the policy." *Id.* at 753. It went on to hold that bad faith is a state of mind indicated by acts and circumstances, and that bad faith " 'would be the intentional disregard of the financial interests of the plaintiff in the hope of escaping full responsibility imposed upon it by its policy.' " *Id.* at 754 (quoting *Johnson v. Hardware Mutual Casualty Co.*, 109 Vt. 481, 1 A.2d 817, 820 (1938)). Acting in bad faith is more than acting negligently. *See Freeman v. Leader National Insurance Company*, 58 S.W.3d 590, 598 (Mo.App.2001).

Having held that the trial court did not err in granting partial summary judgment in favor of The Bar Plan on its declaratory judgment claim that Counts I–IV of the malpractice action were all one claim under the 2008 Policy, and that the 2009 Policy did not apply to any of the counts of the malpractice action, we cannot hold that The Bar Plan acted in bad faith in refusing to settle Count IV of CMA's malpractice action under the 2009 Policy limits of $250,000, as the 2009 Policy did not provide coverage for Count IV. Regarding Counterclaim I, The Bar Plan had offered to pay the $250,000 policy limits under the 2008 Policy to settle the entire malpractice action, i.e., a complete release of all claims against its insureds. There was no bad

faith where the insurer offered to settle for the full policy limits for an unconditional release of all claims, and it is difficult to see how offering to settle for the policy limits would constitute the intentional disregard of the plaintiff's financial interests in the hope of escaping full responsibility under the policy. Contrary to the argument of Kime, there was never a settlement agreement regarding Counts I through III of the malpractice action. Rather, The Bar Plan offered the 2008 Policy limit of $250,000 on February 19, 2010, stating:

> ... I have been authorized to offer our insured's policy limits of $250,000 in full and complete settlement of all of your client's claims and causes of action against our insureds. Said offer would be in exchange for a full and complete release executed by your client(s) in favor of our insureds ...

CMA's counsel responded that same day that "Your offer appears to be different and broader than my demand. Please clarify." The Bar Plan replied within an hour that:

> ... We have offered your client the totality of the insurance limits available to cover your client's claim. As explained in my previous correspondence to you, the various matters articulated by your client as complaints about our insureds' representation are intertwined, are related acts, and are treated under the insureds' policy as a single claim and thus subject to a single limit of coverage.

On February 25, 2010, The Bar Plan sought to clear up any confusion, and restated that it had made an offer to make "a one-time payment of $250,000 to settle your client's claims[,]" noting that CMA's total demand exceeded that amount. CMA's counsel replied:

> Both claims outlined in my letters and the suit papers are settled for the $250,000. I am sorry if I was not clear. You are correct that my letters had two demands. Your earlier letter claimed that there was only one limit of $250,000 available for the two claims and I am not disputing your position. . . .

The Bar Plan promptly replied "Thank you for that clarification." CMA's counsel responded within three hours with the e-mail set forth earlier in this opinion that informed The Bar Plan that CMA was filing its First Amended Petition that added Count IV.

That e-mail provoked a sharp response from The Bar Plan as follows:

> Nice try, but I don't think that gets you to a different set of limits. Count Four arises out of the same activities about which your client complains; it is just a new tort claim. It arises out of the same or related underlying facts, and is thus treated as a single claim. As concerning the timing of your client's claim, please note the following policy language [quoting the MICC provision].
>
> I truly hope that this is merely a misunderstanding on your part of the insurance coverage available, rather than engaging in a bit of gamesmanship. My consent from my insureds to settle your client's claims and causes of action is limited to a settlement, for the policy limit, of all such claims and causes of action, no matter the theory asserted or damage claimed. Given this new position/theory taken by your client, it does not appear we have an agreement. If I do not hear from you by the end of the day tomorrow as to your client's agreement to settle ALL claims and causes of action against our insured, I will retain defense counsel to begin the defense of these claims pursuant to your obligations under the insurance policy.

The response of CMA's counsel was equally sharp.

I did read the policy and I think you need to read your policy more closely.
. . .
Whether or not your policy covers this claim 4 is an issue that a judge can decide. The claim in count Four is made in a new period and [SSB], unless it wants to blow its coverage with this year's insurer, needs to report the claim to this year's insurer. I assume [SSB] will do so.

My demand to settle the case was clear and you accepted it per your emails. I assume you know that the trial judge has authority to decide a Motion to Enforce Settlement. Based on what you are saying I will go ahead and prepare said motion. I hope you on reflection consider otherwise and proceed with your agreement.

The Bar Plan replied as follows:

We remain the insured's carrier. See my email to you of February 19, 2010 for the specifics of our offer to settle. You have not accepted same, but rather have attempted a qualified acceptance with additional demands, which is no acceptance at all. So, by the content of your email, it appears we do not have an agreement.

All defense costs incurred hereafter will reduce the limits of insurance coverage available to resolve your client's claims.

Regarding Count IV, The Bar Plan proved to be correct in its interpretation of its policy and the MICC provision. The 2009 Policy did not cover Count IV, which was part of a single claim under the 2008 Policy along with Counts I, II, and III. The Bar Plan offered the maximum under the 2008 Policy. It was not liable for more, whether it settled the case for $250,000 or defended SSB and Kime and incurred $250,000 in legal expenses, as the cost of the defense came from the amount available for coverage. The Bar Plan's financial interest was the same regardless. Had The Bar Plan settled only Counts I–III for the 2008 Policy limit of $250,000, Kime and SSB would still have been potentially liable under Count IV, but with no insurance coverage left. Mr. Sauerwein, the insured designee of the policyholder, SSB, was carbon-copied on all of the e-mails set forth in this opinion. Mr. Sauerwein made no demand to settle only Counts I–III and to leave Count IV unresolved. The Bar Plan did not intentionally disregard the financial interests of the policyholder, SSB, which had the power to demand settlement, and it clearly did not act " 'in the hope of escaping full responsibility imposed upon it by its policy[,]' " given that it offered the full limit of the 2008 Policy. Accordingly, it did not act in bad faith in failing to settle. Point denied.

### III. Motion to Quash Discovery

In his third point relied on Kime avers that the trial erred in granting SSB's motion to quash his notice of deposition and subpoena seeking a copy of the complete file that Plunkert and his firm created while defending Kime in the malpractice action because Kime as the client owned the entire file and had an absolute right to a copy of the file on demand. Kime alleges that the attorney-client privilege did not apply in that he waived the privilege and required the entire file to prepare for and take the deposition of The Bar Plan's corporate representative.

Trial courts have broad discretion in administering the rules of discovery, and appellate courts will not disturb the exercise thereof absent an abuse of discretion. *Sanders v. Ahmed*, 364 S.W.3d 195, 213 (Mo. banc 2012). A trial court does not have discretion to deny discovery of matters that are relevant to a lawsuit and are reasonably calculated to lead to

the discovery of admissible evidence, unless such matters are work product or privileged. *See id.* Rule 56.01(b) excludes privileged material from discovery. Privileged material is any professionally-oriented communication between attorney and client, whether or not it is made in anticipation of litigation or in preparation for trial. *State ex rel. Tillman v. Copeland,* 271 S.W.3d 42, 45 (Mo.App.2008). The communication must be made in order to secure legal advice in order to be privileged communication. *Id.* However, it is also true that a client's files belong to the client, and not to the attorney or law firm representing the client, and the client may direct the attorney or law firm to transmit the file to newly retained counsel. *In the Matter of Cupples,* 952 S.W.2d 226, 234 (Mo. banc 1997).

If the client file sought by Kime only involved the representation of Kime, it would appear that he would be entitled to that file. This is not the situation. Plunkert and his law firm represented both Kime and SSB jointly in the malpractice action, and they were co-clients. In the Settlement Documents executed by and between Bill Sauerwein, SSB, CMA, Kime, and Tom and Adele Daakes, SSB and Kime made a limited waiver of the attorney-client privilege and the insurer-insured privilege as follows:

> [Kime and SSB agree] to waive any attorney-client privilege or other privilege including, but not limited to the insurer/insured privilege with respect to communications:
>
> > From [Kime and/or SSB], or any its agents or attorneys, to:
> >
> > > The Bar Plan or its agents or attorneys; or Any other insurance company or its agents or attorneys, And
> >
> > To [Kime and/or SSB], or any of his agents or attorneys, from:

> > > The Bar Plan or its agents or attorneys; or Any other insurance company or its agents or attorneys.

This was not a general waiver of the attorney-client privilege by SSB.

▉▉▉▉ In filing its motion to quash, SSB asserted the attorney-client privilege. The Missouri Supreme Court has stated at some length the critical importance of this privilege. In *State ex rel. Great American Insurance Co. v. Smith,* 574 S.W.2d 379, 383 (Mo. banc 1978), the Missouri Supreme Court held in favor of a broad attorney-client privilege, stating:

> There clearly is a societal need for persons to be able to employ and consult with persons trained in the law for advice and guidance as to legal matters. . . . [C]onfidentiality of the communications between client and attorney is essential for such relationships to be fostered and to be effective. . . .
>
> The nature and complexity of our present system of justice and the relationships among people and between people and their government make the preservation and protection of the attorney-client privilege even more essential. If this is to be accomplished, when one undertakes to confer in confidence with an attorney whom he employs in connection with the particular matter at hand, it is vital that all of what the client says to the lawyer [a]nd what the lawyer says to the client [is] to be treated as confidential and protected by the attorney-client privilege. This is what a client expects.

▉▉▉▉ Missouri courts have not addressed the issue presented here, namely the right to one's client file versus an assertion of the attorney-client privilege by a co-client. Both a client's right to his or her own client file and the attorney-client privilege are important. However, we need not address this issue. Assuming

*arguendo* that the trial court did err and abuse its discretion in quashing the deposition and subpoena, this is not reversible error unless Kime was prejudiced thereby. Prejudicial error is an error that materially affects the merits and outcome of the case. *D.R. Sherry Construction, Ltd. v. American Family Mutual Insurance Co.,* 316 S.W.3d 899, 904 (Mo. banc 2010). The trial court properly granted summary judgment in favor of The Bar Plan, namely that the 2009 Policy did not apply to the causes of action in the malpractice action, and that The Bar Plan did not act in bad faith in refusing to settle the case where it offered to settle all causes of action by CMA against SSB and Kime for the 2008 Policy limit of $250,000. Kime and his counsel had access to all of the material in the limited waivers in the Settlement Agreement, which covered any and all communications between The Bar Plan, its attorneys, and its agents and Kime and/or SSB. It is impossible to see what could be in the client file that was not already available by the limited waiver that could change the propriety of the grants of summary judgment. The trial court did not commit prejudicial error. Point denied.

## Conclusion

The judgment of the trial court is affirmed.

SHERRI B. SULLIVAN, J., and GLENN A. NORTON, J., concur.