

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| JIMMIE LEE TAYLOR, | ) | |
| | ) | |
| Appellant, | ) | WD76380 |
| | ) | |
| v. | ) | OPINION FILED: April 29, 2014 |
| | ) | |
| THE BAR PLAN MUTUAL | ) | |
| INSURANCE COMPANY, ET AL., | ) | |
| | ) | |
| Respondents. | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Sandra Midkiff, Judge

Before Special Division: Cynthia L. Martin, Presiding Judge, Gary D. Witt, Judge and
Zel M. Fischer, Special Judge

This case involves the interpretation of an insurance contract providing coverage for legal malpractice. Appellant Jimmie Lee Taylor ("Taylor"), upon the advice of his now-disbarred attorney, made several loans to the law firm of the attorney and to a separate entity, which was also a client of the attorney. After both the attorney and the other entity defaulted on the loans, Taylor prevailed in a civil action against the attorney for malpractice. In this subsequent equitable garnishment action, the attorney's insurer, Respondent The Bar Plan Mutual Insurance Company ("The Bar Plan"), was granted summary judgment. Taylor appeals. We reverse.

## FACTUAL AND PROCEDURAL HISTORY[1]

This matter arises from an attorney's representation of a client in the midst of numerous significant ethical breaches. The facts are not in dispute. In September 2006, Taylor, the trustee and sole beneficiary of the Jimmie Lee Taylor and Leilla V. Taylor Revocable Trust (the "Trust"),[2] retained James C. Wirken ("Wirken") of the Wirken Law Group as his attorney to handle certain legal claims regarding the management of the Trust. Wirken's legal representation continued into 2008 and included matters relating to estate planning and estate administration. Throughout the extended legal representation, Taylor came to rely on the advice of Wirken.

Wirken was the 100 percent equity owner in the Wirken Law Group. Although he has since been disbarred, during all relevant times, Wirken was licensed to practice law in Missouri, and Wirken Law Group was a Missouri professional corporation engaged in the practice of law. The Bar Plan is an insurance company doing business in Missouri and sold Wirken and the Wirken Law Group their professional liability insurance.

The underlying dispute arose from two sets of loans made by Taylor (from the Trust) and facilitated by and on the advice of Wirken: three loans went directly to Wirken Law Group, and three loans to Longview Village Development Company ("Longview"). On the latter three loans, Wirken received a "finder's fee" from Longview for securing the loans.

---

[1] We view the facts and all reasonable inferences in the light most favorable to the party against whom the summary judgment was entered. *Mo. Pub. Entity Risk Mgmt. Fund v. Am. Cas. Co. of Reading*, 399 S.W.3d 68, 73 (Mo. App. W.D. 2013).

[2] Taylor is the son of Leilla V. Taylor, who died in 2007. Wirken's representation also included Taylor's wife, Cindy Taylor, who is not a party to this appeal.

**Loans to the Wirken Law Group**

Prior to April 5, 2007, while Wirken was representing Taylor and the Trust, Wirken approached Taylor about the Trust loaning money to the Wirken Law Group. Wirken did not inform Taylor that the Wirken Law Group was strapped for cash and needed additional funding for its needs and for his personal expenses. Unknown and undisclosed to Taylor, Wirken had approached multiple lending institutions for loans and had been rejected, Wirken's personal assets were heavily leveraged, and Wirken also had unpaid loans from multiple other clients. Wirken falsely indicated to Taylor that he had multiple contingent fee cases that had already been settled but not yet paid, the proceeds of which would be sufficient to repay the loans to the Trust.

The Wirken Law Group borrowed money from Taylor three times in 2007. The agreements were executed by way of promissory notes, guaranteed by Wirken personally, but Taylor took no security interest in any of Wirken's assets or in the Wirken Law Group or its assets. Those three loans totaled $250,000, each with ten percent interest until default and fifteen percent thereafter. The three notes all provided that a reasonable attorney fee was due in the event the notes were placed for collection.

When Wirken was drafting these notes and advising as to the method of repayment, Taylor believed that Wirken was his lawyer and was acting in his and the Trust's best interests. Wirken conceded that he was the attorney for Taylor and the Trust and had a fiduciary duty to them as clients. Nonetheless, Wirken never suggested that Taylor seek the advice of an uninterested lawyer before entering into these transactions,

3

nor did he make any written disclosure regarding his ethical obligations under the Code of Professional Responsibility when engaging in a business transaction with a client.

Taylor was never repaid for these three loans.

**Loans to Longview**

As for the three loans to Longview, sometime prior to May 24, 2007, Wirken advised Taylor that Longview was seeking short-term lenders for its projects and encouraged him to become a lender. Longview was another of Wirken's clients. Wirken advised Taylor that any loans to Longview would be secured by the personal guaranty of Jeffrey Montgomery, a Kansas City Royals baseball player, implying that Wirken would review the paperwork to assure that the personal guaranty was included.[3] Taylor loaned Longview a total of $261,740 in the three 2007 loans. Wirken drafted all of the agreements. The agreements were executed by way of promissory notes, bore interest at the rates of thirty-two to thirty-six percent, and provided for reasonable attorney fees upon default.

The first loan was executed May 24, 2007 and was for $150,000. Per the trial court's judgment, that loan was "memorialized by a note from Longview." It bore thirty-two percent interest, was due August 24, 2007, and required reasonable attorney fees in the event of default. The first ninety days of interest were paid in advance and subtracted from the loan amount, so that funding the note only required $138,000.

The documents signed by Longview included an executed promissory note and a second mortgage on certain real property that Wirken informed Taylor "will be recorded

---

[3] Jeffrey Montgomery paid Taylor $50,000 to be released from any obligation on all three notes.

in Johnson County, Kan." Taylor's check for $138,000 was payable to The Wirken Law Group Trust Account and was used to fund the loan. Taylor later learned that the mortgagor of the property serving as collateral for the $150,000 loan did not own the property offered as security, that the mortgage was never recorded, and that Wirken did not confirm ownership of the property or the recording of the mortgage prior to Wirken funding the loan from the Wirken Law Group Trust Account. Taylor also later learned that Wirken was paid a "finder's fee" for delivering Taylor as a lender and that Longview owed Wirken money at the time that Wirken brought Longview to Taylor's attention.

The second loan Taylor made to Longview was executed June 6, 2007 for $90,000, payable to the Wirken Law Group Trust Account. It bore thirty-six percent interest, was due July 7, 2007, and provided for the payment of reasonable attorney fees in the event of default. This note was secured in part by the pledge of a Smith-Barney account. Taylor later learned that the Smith-Barney account did not exist and that Wirken had not confirmed its existence prior to funding the loan from his trust account.

As for the third loan, on June 22, 2007, per Wirken's instruction, Taylor loaned Longview $21,740 with an interest rate of thirty-six percent, due on July 22, 2007. The loan was also funded with a check to Wirken's trust account and provided for a recovery of attorney fees in the event of default.

The Trust was never repaid for these three loans.

**Subsequent Litigation**

Taylor filed an action against Wirken and the Wirken Law Group, alleging breach of fiduciary duties to him as his lawyer in representing him and causing him to fund the

5

various loans.[4]  The Bar Plan provided Wirken and the Wirken Law Group a defense against Taylor's suit, but it reserved the right to deny coverage if the court entered judgment against either defendant for acts or omissions its policy did not cover.  Wirken requested that The Bar Plan either withdraw its reservation of rights or withdraw from the defense.  The Bar Plan withdrew its defense, and Wirken and the Wirken Law Group hired their own counsel.

After a bench trial, the trial court entered judgment in favor of Taylor.  As to the first set of loans, the trial court found that an attorney-client relationship existed, that Wirken drew the notes memorializing the loans to the Wirken Law Group, and that Wirken breached his fiduciary duty to Taylor.[5]  As to the second set of loans, the trial court also determined that the attorney-client relationship was in force during the loan transaction with Longview and that Wirken "was performing legal services . . . by passing documents [from Longview to Taylor] through his offices, by implying that Wirken would review the paperwork and the transaction details to see that Taylor's interests were served, and by serving as the vehicle for funding the loans from Taylor to Longview."  The trial court also determined that Wirken breached his fiduciary duty by neglecting to tell Taylor about the fee he received from Longview and that Longview was indebted to Wirken.  The trial court found that Wirken's breach of his fiduciary duties was the proximate cause of Taylor's damages.  Accordingly, the trial court assessed

---

[4] Taylor was the sole beneficiary of the Trust and was thus entitled to receive the unpaid loans owed to the Trust.

[5] For reasons we discuss, *infra*, the legal theory pursued by Taylor and the Trust is significant.  To find a breach of fiduciary duties, the trial court in Taylor's action against Wirken and The Wirken Law Group had to find the existence of an attorney-client relationship, and defalcation in the provision of legal services in violation of that fiduciary relationship.

damages based on the face value of the loans plus interest and attorney fees in the amount of $415,971.69 on the loans to the Wirken Law Group and in the amount of $524,873.13 on the loans to Longview.

Taylor then filed an equitable garnishment action[6] against The Bar Plan, which is the subject of this appeal, seeking to recover the damages assessed in the judgment against Wirken and the Wirken Law Group. The trial court in the garnishment action determined that Wirken and the Wirken Law Group were engaged in the provision of legal services to Taylor in connection with efforts to document the various loans and/or collateral security for the loans, thus bringing the activity within the coverage expressed by the insuring agreement,[7] but it was subject to a policy exclusion. Specifically, the trial court granted summary judgment to The Bar Plan, determining that the activity was excluded by Section III(B)(4) of the policy, which states that for "ANY CLAIM BASED

---

[6] An equitable garnishment action is a means by which an injured party can seek recovery against a tortfeasor's insurer. § 379.200. All statutory references are to RSMo 2000 as currently supplemented unless otherwise indicated.

[7] The portion of the policy under which the trial court found coverage contracted that The Bar Plan "will pay on behalf of an Insured all sums, subject to the Limit(s) of Liability, Exclusions and terms or conditions contained in this Policy, which an insured shall be legally obligated to pay as Damages as a result of CLAIMS . . . by reason of any act or omission by an Insured acting in a professional capacity providing Legal Services." The question of coverage is not an issue on appeal. In fact, that question was necessarily determined by the trial court in Taylor's underlying lawsuit in light of his election to pursue a claim for recovery on the defaulted notes on a theory of breach of fiduciary duty in the provision of legal services, in lieu of, by way of example, a theory of breach of contract on the notes themselves. *See*, *supra*, note 5. Because the trial court in the underlying lawsuit determined that Wirken and The Wirken Law Group had provided legal services to Taylor in connection with the various loans, The Bar Plan was estopped from challenging this determination in the equitable garnishment proceeding. *See Assurance Co. of Am. v. Secura Ins. Co.*, 384 S.W.3d 224, 232 (Mo. App. E.D. 2012) ("One who has undertaken to indemnify another against loss arising out of a certain claim and has notice and opportunity to defend an action brought upon such a claim is bound by the judgment entered in such action, and is not entitled, in an action against him for breach of his agreement to indemnify, to secure a retrial of the material facts which have been established by the judgment against the person indemnified.") (quoting 17 LEE R. RUSS, COUCH ON INSURANCE sec. 239:73 (3d ed. 1995)).

Because the factual issues necessarily determined in the underlying lawsuit effectively predisposed the trial court's coverage determination in the equitable garnishment case, we are not permitted to assess whether the trial court's entry of summary judgment in favor of The Bar Plan could be alternatively affirmed because it erroneously found that Wirken's efforts in securing and documenting the loans, particularly the Wirken Law Group loans, were covered legal services. This opinion therefore assumes, without analyzing or deciding, that Wirken's activities were within the coverage of The Bar Plan policy.

7

UPON OR ARISING OUT OF…[a]n Insured's capacity as…[a] legal representative of investors in regard to and resulting in investment in an enterprise in which an Insured owns an equity interest or for which the Insured receives a fee or commission from an Entity other than the investor."

Taylor appeals from the summary judgment in the equitable garnishment action.

## ANALYSIS

Taylor argues that the trial court erred in entering summary judgment in favor of The Bar Plan on the ground that the phrase "resulting in investment in an enterprise" in the exclusion is ambiguous. Taylor additionally argues: (1) that a covered concurrent proximate cause will result in coverage even if another cause is excluded, (2) that The Bar Plan's asserted exclusion is not applicable because the Wirken Law Group is a professional corporation in which non-lawyers are legally barred from "investing," and (3) that additional ambiguity arises because the exclusion is dependent on other "capacities" in that it combines multiple, separate exclusions by use of the word "and." Because we agree with Taylor that the phrase "resulting in investment in an enterprise" and the terms "investment" and "investor" are ambiguous as used within the policy and thus that The Bar Plan did not meet its burden of establishing that the exclusion applied, the cause is reversed and remanded.

### Standard of Review

Our Supreme Court has set forth our standard of review:

Summary judgment is appropriate only when the moving party demonstrates that "there is no genuine dispute as to the facts" and that "the facts as admitted show a legal right to judgment for the movant." The

8

movant bears the burden of establishing both a legal right to judgment and the absence of any genuine issue of material fact required to support the claimed right to judgment. The propriety of summary judgment is purely an issue of law, and this Court's review is essentially *de novo*. "As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment."

*Bob DeGeorge Assoc.'s, Inc. v. Hawthorn Bank*, 377 S.W.3d 592, 596 (Mo. banc 2012) (quoting *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 380 (Mo. banc 1993)) (citations omitted).

Additionally, the interpretation of an insurance policy is a question of law that we also determine *de novo*. *Seeck v. Geico Gen. Ins. Co.*, 212 S.W.3d 129, 132 (Mo. banc 2007) (citations omitted); *Blumer v. Auto. Club Inter-Ins. Exch.*, 340 S.W.3d 214, 218 (Mo. App. W.D. 2011) (holding that where "resolution of the case involves the interpretation of an insurance contract, we give no deference to the circuit court as contract interpretation is a question of law").

### General Principles of Interpretation

As the appeal concerns whether policy language is ambiguous, we note at the outset that "[w]e read a contract as a whole and determine the intent of the parties, giving effect to that intent by enforcing the contract as written." *Thiemann v. Columbia Pub. Sch. Dist.*, 338 S.W.3d 835, 840 (Mo. App. W.D. 2011) (citation omitted). In so doing, we give the language in an insurance contract its plain and ordinary meaning. *Id.* "If, giving the language used its plain and ordinary meaning, the intent of the parties is clear and unambiguous, we cannot resort to rules of construction to interpret the contract." *Id.* Mere disagreement over the interpretation of the terms of a contract does not create an

9

ambiguity. *Id.* In examining whether the language used in an insurance policy is ambiguous, the language is normally considered in the light in which it would normally be understood by the lay person who bought and paid for the policy. *Blumer,* 340 S.W.3d at 218 (citation omitted). If no ambiguity exists, the insurance contract will be enforced as written. *Rodriguez v. Gen. Accident Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo. banc 1991) (citation omitted).

An "ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." *Seeck,* 212 S.W.3d at 132 (citation omitted); *see also Mendota Ins. Co. v. Ware*, 348 S.W.3d 68, 71 (Mo. App. 2011) (stating that, the "insured is entitled to a pro-coverage interpretation of an insurance policy if the terms are susceptible of two possible interpretations and there is room for construction") (internal citations and quotations omitted). We resolve "ambiguities in favor of the insured." *Fanning v. Progressive Nw. Ins. Co.*, 412 S.W.3d 360, 364 (Mo. App. W.D. 2013) (citations omitted). "This rule is especially applicable where insurance is first 'granted' and is then followed by provisions limiting or avoiding liability." *Rice v. Shelter Mut. Ins. Co.*, 301 S.W.3d 43, 47 (Mo. banc 2009).

Put another way, Missouri strictly construes exclusionary clauses against the drafter. *Manner v. Schiermeier*, 393 S.W.3d 58, 62 (Mo. banc 2013) (citation omitted). "The burden of showing that an exclusion to coverage applies is on the insurer." *Id.* The *Manner* court explicitly noted in the context of a summary judgment, which is the procedural juncture we face here, that the "burden was on the insurers to prove" that an

exclusion applied.  *Id*. at 60.  We construe ambiguities in favor of the insured for two reasons:

> (1) insurance is designed to furnish protection to the insured, not defeat it; ambiguous provisions of a policy designed to cut down, restrict, or limit insurance coverage already granted, or which introduce exceptions or exemptions, must be *strictly construed* against the insurer; and (2) as the drafter of the policy, the insurance company is in the better position to remove the ambiguity from the contract.

*Golden Rule Ins. Co. v. R.S.,* 368 S.W.3d 327, 334 (Mo. App. W.D. 2012) (citation omitted) (emphasis added).

## Reasonable Attorney Standard

Before we can proceed with our review of the terms of this policy we must first determine the proper lens through which we view its terms.  While the review of an insurance policy is normally based on the understanding of a reasonable lay person, when reviewing a policy of legal malpractice, the only possible purchasers of the policy would be attorneys.  Our review hinges on what an average *insured* would believe the policy language means.  *Shiddell v. The Bar Plan Mut. Ins. Co.*, 385 S.W.3d 478, 485 (Mo. App. W.D. 2012) (stating that a dictionary definition was "consistent with what an ordinary person purchasing the policy would understand . . . and certainly what an ordinary attorney would understand").  A reasonable insured in the context of legal malpractice insurance is a reasonable attorney because *only* attorneys purchase legal malpractice insurance.  Of course in the context of other types of insurance (such as automobile insurance), an ordinary person of average understanding if purchasing insurance would

11

not be subject to the reasonable attorney standard, regardless of whether the person who bought the insurance happened to be an attorney.

On this issue of first impression, we determine that the proper lens for review of a legal malpractice insurance policy would be through the eyes of a reasonable attorney who purchased the insurance.[8] This principle is consistent with precedent of the Supreme Court of Missouri. *See Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009) ("[I]n construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary person of average understanding *if purchasing insurance . . . .*") (emphasis added); *Robin v. Blue Cross Hosp. Serv., Inc.*, 637 S.W.2d 695, 698 (Mo. banc 1982) (stating that terms are given "'the meaning that would ordinarily be understood by the layman *who bought and paid for the policy*'") (emphasis added; citation omitted).

## Discussion

The isolated issue we address is whether The Bar Plan met its burden of establishing that the policy it drafted excluded the loans that Taylor made to Wirken and Longview. The contested exclusion states as follows:

> THIS POLICY DOES NOT PROVIDE COVERAGE FOR ANY CLAIM BASED UPON OR ARISING OUT OF: . . .
>
> B.     An Insured's capacity as . . .
>
> 4.     A legal representative of investors in regard to and resulting in investment in an enterprise in which an Insured owns an equity interest or

---

[8] The parties in their briefing and argument spend considerable time focusing on how Taylor and Wirken would have categorized these loans at the time they were entered into. This likewise applies the wrong standard of review, because our review is restricted to what a reasonable attorney would have believed the policy covered or excluded at the time the policy was purchased, not at the time the disputed transaction was entered into.

for which the Insured receives a fee or commission from an Entity other than the investor.

Taylor argues that The Bar Plain did not meet its burden because the terms "investors" and "investment in an enterprise," neither of which is defined in the policy, are ambiguous inasmuch as they must encompass within their definitions "loans" in order to apply to the facts at issue. The trial court found that the three loans to Wirken were excluded by the policy because Wirken acted "as a legal representative for Mr. Taylor 'in regard to and resulting in investment in an enterprise in which an Insured owns an equity interest'" because Wirken owned 100 percent equity interest in The Wirken Law Group. As for the Longview loans, the trial court found that "Wirken received a commission fee from Longview" and thus the loans to Longview were "investments 'for which the Insured receives a fee or commission from an Entity other than the investor.'" Though the trial court's findings appear to have accurately honed in on the uncontested fact that Wirken had an equity interest in the Wirken Law Group, and that Wirken received a commission on the Longview loans, the trial court offered no explanation for its conclusion that Wirken's legal services in connection with the loans were provided to an "investor" with regard to and "resulting in investment in an enterprise." Of course, the intended meaning of these terms is controlling here.

The operative policy exclusion applies only if the insured attorney acted as a legal representative of "*investors . . . resulting in investment in an enterprise.*" We must read the words of the exclusion and the contract as a whole and in proper context. *Thiemann*, 338 S.W.3d at 840. In so doing, we agree with Taylor that The Bar Plan did not meet its

13

burden of establishing that a reasonable attorney purchasing this insurance[9] would have reasonably understood that legal services provided to document loans being made by a client would be excluded because the loans are "investments in an enterprise." For reasons explained below, either the policy exclusion is simply not applicable to these facts or it cannot be enforced because it is ambiguous.

The distinction between financing a business or enterprise through equity versus debt runs throughout the law. An attorney purchasing a policy through The Bar Plan may understand a financing that provides an equity or ownership interest to be "resulting in investment in an enterprise" with capital investments, various stocks, securities, shares, and other partnership or membership interests at stake as being the most common examples. The return on these investments is typically tied to the performance of the enterprise.[10] All financing does not necessarily constitute an "investment in an

---

[9] In many instances the purchaser of legal malpractice insurance is a law firm consisting of more than one attorney and the firm and the individual attorneys are purchasing this insurance to protect the firm and the individual attorneys from liability brought on by the legal malpractice of one of the attorneys employed by the firm.

[10] Within, for example, the Investment Company Act of 1940, 15 U.S.C. § 80a-3, "investment company" is defined in part as an entity engaging in the business of investing or reinvesting or trading in securities. Similarly, under the Securities Exchange Act of 1934, in determining whether a contract, transaction, or scheme is an "investment contract" within the definition of "securities," one element is that there will be the expectation that profits will be derived from the entrepreneurial or managerial efforts of others. *SEC v. W.J. Howey & Co.*, 328 U.S. 293, 298-99 (1946); *Reves v. Ernst & Young*, 494 U.S. 56, 64 (1990); *Long v. Shultz Cattle Co.*, 881 F.2d 129, 132 (5th Cir. 1989) (citing 15 U.S.C. §§ 77b(1) and 78c(a)(10)). Along that line, multiple provisions of the Revised Statutes of Missouri require "investment advisors" to register with the U.S. Securities and Exchange Commission. *See, e.g.*, sections 103.032 and 166.415.5.

It would be hasty and incorrect to conclude that a note is always a security. The U.S. Supreme Court fashioned a multi-part test for determining whether a note constitutes a security pursuant to the Securities Exchange Act. *Reves*, 494 U.S. at 65-69. The *Reves* Court noted that "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.' If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, ***to correct for the seller's cash-flow difficulties***, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a 'security'" (emphasis added). Another factor in the *Reves* Court's determination that notes were securities in that case was that was there was "common trading" of the notes and that they were offered and sold to a broad segment of the public. *Id.* at 68.

14

enterprise," however. Loans similar to those in the case at bar operate differently because they do not confer equity or ownership interests and instead constitute a business's debt. In short, loans are not always included among types of "investments." *See, e.g., In re Keisker's Estate*, 168 S.W.2d 96 (Mo. 1943) (noting that the terms "loan" and "invest" are often incorrectly used interchangeably; statute used the word "invest" to denote the idea of purchase, and "loan" to denote idea of making a loan rather than purchase); *In re Terry Mfg. Co., Inc.*, No. 03-32063, 2007 WL 274319, at *8 (Bankr. M.D. Ala. Jan. 25, 2007) (noting that the "term investment is ambiguous, as it can mean either debt or equity"); *Engelking v. Inv. Bd.*, 458 P.2d 213, 219 (Idaho 1969) (distinguishing the terms "loan" and "investment"); *In re Owen's Estate*, 36 N.Y.S.2d 60, 62 (N.Y. Sur. 1942) (holding that "[t]he word 'investment' is a vague term and no general rule can be laid down as to its meaning"); *Reves*, 494 U.S. at 62 (holding that notes are "used in a variety of settings, not all of which involve investments").

In giving the language of the insurance contract its plain and ordinary meaning, we note the following illustration. If a business owner is asked to list a business's "debts," the owner will list the business's banker, the revolving operating loan, the Mastercard, Visa, and/or American Express, and the business's other creditors. However, if a business owner is asked to list the business's "investors," the owner will list the stockholders, partners, and members (either active or passive) -- those with equity or ownership

---

Fortunately, our question presented does not entail application of the multi-factor test, and we note the cases and statutes only to highlight the lack of conclusiveness and the indistinctness of the matter. For our purposes, perhaps what best summarizes *Reves* was the Court's observation that "common stock is the quintessence of a security . . ., but *the same simply cannot be said of notes, which are used in a variety of settings, not all of which involve investments*." *Id.* at 62 (emphasis added).

15

interests. It would be a complete stretch for any business owner to consider the credit card company, banker, lender, or other creditor an "investor" in the business or enterprise. In fact, the definition of "enterprise" in Black's Law Dictionary, Ninth Edition, is consistent with this point. "Enterprise" is therein defined as a "venture or undertaking especially one involving financial commitment." This definition suggests a financial commitment more in line with ownership or management control, and not simple loans.

All six loans in this case were simple, unsecured loans that charged interest according to the terms of the promissory notes but in no way evidenced a transaction "resulting in investment in an enterprise." These loans did not confer to Taylor any property or ownership interest other than the right to be repaid with interest. To be sure, Taylor never obtained the right to share in the profits of either business. Were it the case that the policy exclusion defined "investment" to include loans or omitted the phrase "resulting in investment in an enterprise," our resolution of whether such a loan is included in that exclusion may differ. But as noted above, as the drafter of the policy, the insurance company was in the better position to remove the ambiguity from the contract, *Golden Rule,* 368 S.W.3d at 334, and the ambiguous language that The Bar Plan drafted instead creates indistinctness and uncertainty.

The Bar Plan's failure to draft unambiguous policy language and thus meet its burden of establishing that the exclusion applied is also evident in the duplicity of definitions for investment in Black's Law Dictionary. The first definition of investment is an "expenditure to acquire property or other assets in order to produce revenue; a capital outlay." That first definition includes three examples of the term: (1) a "fixed-

16

dollar investment," which is "an investment whose value is the same when sold as it was when purchased," as in "bonds held to maturity, certain government securities, and savings accounts"; (2) a "fixed-income investment," which is an "investment (including preferred stock) that pays a fixed dividend throughout its life and is not redeemable unless the corporation makes a special call"; (3) a "net investment," which is an "investment (including preferred stock) that pays a fixed dividend throughout its life and is not redeemable unless the corporation makes a special call." Black's second definition of "investment" is the "the asset acquired or the sum invested" and contains no examples.

Here, the only example in the first definition that arguably could encompass these particular interest-bearing loans falls within "fixed-dollar investments," perhaps most akin to the ownership of a "savings account."[11] But whether the rest of the first definition includes the loans at issue here as investments is unclear when read with the policy language in mind. Viewed in the context of the exclusion, which is that the loan must "result[] in investment in an enterprise," *no property or other assets were acquired to produce revenue* when Taylor made his loans with either Wirken or Longview by way of promissory notes. It is true that the right to repayment set out in the note may be viewed as an asset in certain contexts, but as set out above, it does not follow that a creditor or other lender necessarily becomes an investor by acquiring an asset. Quite simply, Taylor acquired no interest in any enterprise when he loaned money to Wirken Law Group and

---

[11] The dissent argues that, "The fact that at least one of the Longview loans closely resembled the purchase of a 'zero-coupon bond' demonstrates the complexity of these transactions." However, the fact that none of these loans was a "zero-coupon bond" helps demonstrate the *simplicity* of these transactions. More to the point, a bond is a quintessential security, so far removed from a simple loan that one would not reasonably confuse the two or infer that a loan can be an "investment in an enterprise" solely because a bond is an example of an investment.

17

to Longview, and it would be absurd to expect either Wirken Law Group or Longview to consider Taylor an investor as equally as it would be absurd to consider a credit card company or any other such creditor an investor. *See Mendota*, 348 S.W.3d at 71 (holding that the insured is entitled to a pro-coverage interpretation if the terms are susceptible of two possible interpretations and there is room for construction).

In viewing the language of the exclusion as a whole, it thus appears that the trial court simply missed a step in its analysis. While it is true that Wirken facilitated business transactions between Taylor and Wirken Law Group and between Taylor and Longview, it is not the case that those transactions involved Wirken acting as a legal representative for an investor "resulting in investment in an enterprise," which is the language of the policy exclusion and our context for the ambiguous term. Strictly construing this exclusion against the insurer, as we must, *Golden Rule*, 368 S.W.3d at 334, it is at least reasonable under the legal definition of "investment" that an ordinary purchaser of The Bar Plan policy would not reasonably understand based on these transactions that Taylor was an "investor investing in an enterprise." Rather, an ordinary insured under The Bar Plan would reasonably believe he was providing routine legal services to a client to document simple loans. Stated again and most basically, under common usage, the loans did not ***result in investment in an enterprise*** in which the attorney owns an equity interest or for which the attorney receives a fee or commission from the entity.

That an ordinary purchaser of The Bar Plan policy would not reasonably understand this exclusion to apply is particularly obvious as to the loans to Wirken's practice. Any purchaser of the policy would be well aware of the impossibility of Taylor

18

entering into a transaction "resulting in investment in an enterprise" where the enterprise in question is a legal corporation. § 356.111.1(1) (stating that a professional corporation may issue shares, rights, or options to purchase shares only to those authorized to render the "professional service permitted by the articles of incorporation"). In other words, although the Wirken Law Group was financially indebted to Taylor, Taylor (a non-lawyer) was prohibited by statute from entering any transaction resulting in an equity or ownership investment in the Wirken Law Group. The base question is this: Would a reasonable attorney think that a non-lawyer can invest in his or her law firm? No. Would a reasonable attorney think that a non-lawyer can make a loan, profitable or not, to a law firm? Yes. Can a non-lawyer *invest* in a law firm? No. Thus, a reasonable attorney purchasing this policy may not read the exclusion to include a loan to an entity the lender cannot legally invest in.

As noted above, we strictly construe exclusionary clauses against the drafter and place the burden of showing that an exclusion to coverage applies on the insurer because ***insurance is designed to furnish protection for an insured, not defeat it,*** and because the insurer created the policy language and was in the better position to cure any deficiency. *Golden Rule,* 368 S.W.3d at 334. We particularly note the difficulty of members of a multi-person practice who were not cognizant of the malfeasant actions of one member to guess at the meaning and application of the proffered exclusion after the fact.

We further note that, in arguing that the loans at issue met the policy definition of "investment in an enterprise," The Bar Plan does not seek to elevate the transactions at

19

issue from anything other than mere loans. In other words, The Bar Plan does not argue that the transactions, particularly with respect to Longview, were a specific type of investment cloaked as a loan. To be clear, the undisputed facts are that all of the loans contained fixed interest rates, and the record nowhere indicates that the returns were dependent on the performance of any acquired assets. *Compare Minn. Lawyers Mut. Ins. Co. v. Ahrens*, 432 Fed.App'x. 143, 148 (3rd Cir. 2011) (holding that speculative investments were not converted to loans and so fell within policy exclusion where the "clients expected to profit from . . . success in the gold and commodities futures market, and . . . their expected returns depended upon that success, not on an interest rate").[12]

Similarly, we do not find persuasive The Bar Plan's reliance on *Vaughn v. Guarino-Sanders*, 478 Fed.App'x. 310 (6th Cir. 2012),[13] where the Sixth Circuit considered the very same exclusion. Unlike the case at bar, the parties in *Vaughn* did not contest that the transaction at issue, the purchase of "membership in limited-liability companies as vehicles to buy Florida real estate," in which the insured attorney owned an equity interest, was an investment. *Id.* at 310. If anything, *Vaughn* underscores the difference between becoming a *member* in a company and simply extending credit to a business. Further, as the ambiguity at issue in this case was not even raised in *Vaughn*, that case is irrelevant to our analysis.

In its characterization of our holding, the dissent charges that "Wirken created and had control of the undisputed facts of his own legal malpractice insurance question."

---

[12] Although it is denominated an unpublished federal opinion, we know of no rule prohibiting our citation to this case, in contrast to Missouri Supreme Court Rule 84.16(b), which prohibits the citation of unpublished Missouri opinions.

[13] *Id.*

However, the dissent fails to acknowledge that the fact of the malpractice (and thus of coverage) is *not* an issue in this equitable garnishment action, having already been determined in the underlying action in a manner that binds the insurer. The dissent's analysis fails to apply -- let alone acknowledge -- black-letter law that the insurer bears the burden of showing that an exclusion applies to defeat coverage, and that in sustaining that burden, policy language is strictly construed against the insurer.[14] We do not accept as a "given" the premise of the dissent that a reasonable attorney would not expect coverage under the circumstances of this case. To the contrary, we believe a reasonable attorney would expect the provision of legal services in connection with assisting a client in making loans to be covered under a malpractice policy, and would not expect that coverage to be negated by an exclusion for "investments in an enterprise."

Taylor should not suffer when Wirken's misdeeds were contemplated in the policy or at least were not shown by the insurer to be excluded therefrom. The paying policy holder, despite his covered, undisputed malpractice, and the victim, should not suffer because of the insurer's careless drafting and/or its failure to define "investment" if the insurer indeed meant to exclude the transactions at issue.

We thus determine as a matter of law that the policy exclusion set out in The Bar Plan's policy was indistinct and therefore ambiguous as to whether it included the loans at issue. The Bar Plan bore the burden of showing that an exclusion to coverage applies and

---

[14] Indeed, instead of recognizing and applying black-letter law regarding the burden of proof and the dictate that exclusions are strictly construed against an insurer, the dissent relies on *The Bar Plan Mut. Ins. Co. v. Chesterfield Mgmt. Assocs.*, 407 S.W.3d 621, 629 (Mo. App. E.D. 2013), for broad language regarding policy ambiguities that is quoted from California jurisprudence. But *Chesterfield* and the California case on which it depends concern ambiguities as to coverage (an issue not before this court), not as to an exclusion (the issue that we must address). We prefer to rely on recognized tenets from Missouri jurisprudence that squarely apply to how we are to confront insurance policy exclusions.

21

did not meet that burden. To the contrary, the terms "investment" and "investor" are ambiguous as there is "duplicity, indistinctness, or uncertainty in the meaning of the language in the policy," *Seeck,* 212 S.W.3d at 132, and the terms are not applicable to the facts at bar when read in the context of the entire exclusion, which entails that the transaction result in "an investment in an enterprise."

## CONCLUSION

The trial court's judgment is reversed and remanded for proceedings consistent with this opinion.

_____
Gary D. Witt, Judge

Martin, Presiding Judge, joins in the majority opinion
Fischer, Special Judge, concurs in part and dissents in part in separate opinion



# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| JIMMIE LEE TAYLOR, | ) | |
| | ) | |
| Appellant, | ) | WD76380 |
| | ) | |
| v. | ) | OPINION FILED: April 29, 2014 |
| | ) | |
| THE BAR PLAN MUTUAL | ) | |
| INSURANCE COMPANY, ET AL., | ) | |
| | ) | |
| Respondents. | ) | |

## CONCURRING IN PART AND DISSENTING IN PART OPINION

I agree with the circuit court that the "legal representative of investors" exclusion unambiguously excludes coverage, and, therefore, I respectfully dissent from the result of the principal opinion. I concur with the principal opinion that the standard for determining whether an ambiguity exists in a legal malpractice insurance policy is whether a reasonable attorney would conclude that coverage exists for the advice given or the conduct of the attorney. I dissent from the principal opinion's holding that the phrase "investment in an enterprise" is ambiguous due to the existence of multiple definitions of the word "investment." The circuit court concluded that no reasonable attorney who read the policy could believe that the investment advice given would be covered by this malpractice insurance policy. My view of this case is consistent with the

circuit court in that the six loans James C. Wirken advised his client to make were "investments in enterprises" within the meaning of the policy exclusion. Therefore, I would affirm the circuit court's judgment that denied Jimmie Lee Taylor's claim for equitable garnishment against The Bar Plan Mutual Insurance Company ("The Bar Plan").

## Factual Background

Taylor seeks to recover from The Bar Plan under a legal malpractice insurance policy for the actions of Wirken, the insured and now-disbarred attorney. Wirken advised Taylor to make several loans to his own law firm, the Wirken Law Group, P.C., and to another of Wirken's clients, Longview Village Development Company ("Longview"). Three loans went to the Wirken Law Group, and three went to Longview. Wirken was the sole owner of the Wirken Law Group. Longview paid Wirken a commission based fee for delivering Taylor as a lender. The loans never were repaid, and Taylor sued Wirken for breach of fiduciary duty.

Prior to the six loans, Wirken represented Taylor regarding general estate planning and administration matters. According to the Second Amended Petition in the underlying lawsuit against Wirken for breach of fiduciary duty, at some point Taylor "sought the advice of [Wirken] regarding the investment of" the trust assets. Also according to Taylor's Second Amended Petition in the underlying lawsuit, when Wirken approached Taylor about lending money to Longview, Wirken advised him "that he was aware of a tremendous investment opportunity." The circuit court in the underlying case held a bench trial on the claim for breach of fiduciary duty. The circuit court determined that

2

Wirken was acting within the scope of an attorney-client relationship with Taylor regarding all six loans, and it entered judgment against Wirken and the Wirken Law Group. The circuit court assessed damages based on the face value of the six notes plus interest and attorney fees, totaling $940,844.82.

Taylor then sought to collect on the judgment by suing The Bar Plan directly in this action for equitable garnishment. *See* § 379.200, RSMo 2000. The Bar Plan moved for summary judgment, arguing that Taylor's claim was barred by the "legal representative of investors" exclusion. The circuit court's grant of summary judgment expressly stated:

> The court concludes that coverage is defeated by the unambiguous language of the policy exclusion in Section III(B)(4). Section III(B)(4) of the policy states:
>
> > THIS POLICY DOES NOT PROVIDE COVERAGE FOR ANY CLAIM BASED UPON OR ARISING OUT OF:
> >
> > > B.     An insured's capacity as:
> > >
> > > > 4.     A legal representative of investors in regard to and resulting in an investment in an enterprise in which an Insured owns an equity interest or for which the Insured receives a fee or commission from an Entity other than the investor.
>
> In the loans to Wirken Law Group, it is undisputed that Mr. Wirken had a 100% equity ownership interest in Wirken Law Group. The loans to his law firm fall squarely within the exclusion when he acted as a legal representative for Mr. Taylor "in regard to and resulting in investment [sic] in an enterprise in which an Insured owns an equity interest." The loss on Counts I and II of the Taylor judgment is excluded from coverage by this exclusion.

3

As to the Longview Loan transactions, it is undisputed that Mr. Wirken received a commission fee from Longview for Plaintiff's investments. Wirken describes in his deposition testimony his belief (or assumption) that the "finder's fee" checks he received amount to 5% of the loans made by Taylor. These loans were thus investments "for which the Insured receives a fee or commission from an Entity other than the investor." The loss arising from the Longview loan transactions and loss thereon are excluded under the provisions of Section III B(4) [sic] policy exclusion.

(Amended Judgment & Order Granting Def. The Bar Plan Mut. Ins. Co.'s Mot. for Summ. Judgment at 11-12, L.F. 506-07, Mar. 27, 2013.) Taylor appeals.

## Standard of Review

The trial court makes its decision to grant summary judgment based on the pleadings, record submitted, and the law; therefore, this Court need not defer to the trial court's determination and reviews the grant of summary judgment *de novo*. In reviewing the decision to grant summary judgment, this Court applies the same criteria as the trial court in determining whether summary judgment was proper. Summary judgment is only proper if the moving party establishes that there is no genuine issue as to the material facts and that the movant is entitled to judgment as a matter of law. The facts contained in affidavits or otherwise in support of a party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion. Only genuine disputes as to material facts preclude summary judgment. A material fact in the context of summary judgment is one from which the right to judgment flows.

A defending party . . . may establish a right to summary judgment by demonstrating: (1) facts negating any one of the elements of the non-movant's claim; (2) "that the non-movant, after an adequate period for discovery, has not been able and will not be able to produce sufficient evidence to allow the trier of fact to find the existence of any one of the elements of the non-movant's claim; or (3) that there is no genuine dispute as to the existence of the facts necessary to support movant's properly pleaded affirmative defense." Each of these three methods individually establishes the right to judgment as a matter of law.

The record below is reviewed in the light most favorable to the party against whom summary judgment was entered, and that party is entitled to

4

the benefit of all reasonable inferences from the record. However, facts contained in affidavits or otherwise in support of the party's motion are accepted as true unless contradicted by the non-moving party's response to the summary judgment motion.

*Goerlitz v. City of Maryville*, 333 S.W.3d 450, 452-53 (Mo. banc 2011) (internal citations and quotation marks omitted).

Both the interpretation of an insurance policy and the determination of whether exclusion provisions are ambiguous are issues of law, subject to *de novo* review. *Mendenhall v. Property and Casualty Ins. Co. of Hartford*, 375 S.W.3d 90, 92 (Mo. banc 2012).

## Analysis

In an action for equitable garnishment brought directly against an insurer pursuant to § 379.200, RSMo 2000, recovery depends on whether the insurance policy provides coverage. *Noll v. Shelter Ins. Cos.*, 774 S.W.2d 147, 150 (Mo. banc 1989). The sole issue in this case is whether the "legal representative of investors" exclusion applies. Section III(B)(4) of the policy provides as follows:

> This policy does not provide coverage for any claim based upon or arising out of . . . [a]n Insured's capacity as . . . [a] legal representative of investors in regard to and resulting in an investment in an enterprise in which an Insured owns an equity interest or for which the Insured receives a fee or commission from an Entity other than the investor.

I concur with the principal opinion that the standard for determining whether ambiguity exists in a legal malpractice insurance policy is whether a reasonable attorney would conclude that coverage would be available pursuant to the terms of the policy. *Shiddell v. The Bar Plan Mut. Ins. Co.*, 385 S.W.3d 478, 485 (Mo. App. 2012)

5

(emphasizing what an ordinary attorney would understand the policy to mean). I also agree that this standard is consistent with the Supreme Court of Missouri's decisions in *Ritchie v. Allied Prop. & Cas. Ins. Co.*, 307 S.W.3d 132, 135 (Mo. banc 2009), and *Robin v. Blue Cross Hosp. Serv., Inc.*, 637 S.W.2d 695, 698 (Mo. banc 1982).

This rule makes sense as a general matter. Contract disputes are generally confined to determining the rights of the contracting parties and any third-party beneficiaries, assignees, or delegatees. Accordingly, a contract's terms should be interpreted to attribute the meaning those people would give them, not the meaning the average person in society would give them. *See Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 226 (Mo. banc 2013) ("[T]he primary rule of contract interpretation is that courts seek to determine *the parties'* intent and give effect to it.") (emphasis added). This principle is especially apparent when the dispute concerns whether an attorney has acted within the scope of an exclusion in a legal malpractice insurance policy. The attorney should not be permitted to act in a way that a reasonable attorney would conclude falls outside the scope of coverage, then subject his or her malpractice insurer to liability just because a reasonable *layperson* might believe that terms in a policy exclusion are ambiguous.

The principal opinion concludes that the phrase "investment in an enterprise" is ambiguous, and must be construed against The Bar Plan as the drafter of the policy, because the term "investment" can be defined in different ways. I agree with the circuit court that this exclusion is not ambiguous as applied to the particular transactions at issue in this case. A reasonable attorney would not conclude that Wirken's actions would be

6

covered by his malpractice insurance policy because it is clear that the loans in this case were investments in enterprises. No reasonable attorney in Wirken's position would conclude they were not. The plain language of the policy exclusion bars Taylor's equitable garnishment claim against The Bar Plan.

This court should not resort to canons of construction when the contract provision is clear and unambiguous. *State Farm Mut. Auto. Ins. Co. v. Ballmer*, 899 S.W.2d 523, 525 (Mo. banc 1995). Where no ambiguity exists, the court should not distort policy language to create one. *Shahan v. Shahan*, 988 S.W.2d 529, 535 (Mo. banc 1999); *Shiddell*, 385 S.W.3d at 485 ("Rules of construction are . . . only to be utilized where an ambiguity already exists."). The circuit court determined the applicable exclusion was unambiguous, so it correctly did not resort to any rules of construction.

The principal opinion invokes the canon of construction *contra proferentum* and holds that the "legal representative of investors" exclusion does not bar Taylor's claims because the court should construe it narrowly against the drafter of the insurance policy and in favor of coverage. It holds that the phrase "investment in an enterprise" is ambiguous because a reasonable attorney could conceivably conclude that an investment does not mean a loan but only a purchase of an equity interest in a business. In my view, the insurance policy's use of such a broad phrase as "investment in an enterprise," without limiting its definition, prohibits such a restrictive reading in this case. I agree with the circuit court that the "legal representative of investors" exclusion is clear and unambiguous when applied to the facts of this case because it would be apparent to any reasonable attorney that each of the loans Wirken advised Taylor to make was an

7

"investment in an enterprise" and that Wirken's actions were excluded from insurance coverage.

As the principal opinion notes, there are several different dictionary definitions for the term "investments."  The Bar Plan presents the first definition of "investment" listed in *Webster's Third New International Dictionary*: "an expenditure of money for income or profit or to purchase something of intrinsic value[;] a capital outlay."  *Webster's Third New International Dictionary* 1190 (1993).  Taylor argues that an investment requires a purchase of something, and he urges a definition of "invest" that can be found in the *American Heritage Dictionary*: "to purchase with the expectation of benefit."  *American Heritage Dictionary* 922 (5th ed. 2011).[1]  *Black's Law Dictionary* provides a definition that seems to encompass both: "An expenditure to acquire property or assets to produce revenue; a capital outlay."  *Black's Law Dictionary* 902 (9th ed. 2009).

Despite the existence of multiple definitions, they are not competing definitions, as the principal opinion suggests.  The definitions are not exclusive of one another.  They show only that the term is broad—an investment is *both* an outlay of funds with the expectation that some income or profit will result *and* a purchase with the expectation to receive a benefit.  The policy exclusion at issue here does not provide a specific, restrictive definition otherwise, and it does not confine its use of the word "investment" to only purchases of assets.  Rather, the policy exclusion adopts the word "investment" itself, in all its breadth.

---

[1] Notably, the American Heritage Dictionary also provides a substantially identical definition to the Webster's definition, which does not mention a "purchase."  It is listed as the first definition of "invest": "To commit (money or capital) in order to gain a financial return: *invested their savings in stocks and bonds*."  *American Heritage Dictionary* 920 (4th ed. 2010).

8

As a result, a reasonable attorney would not have concluded that the policy exclusion's use of the phrase "investment in an enterprise" meant that a purchase was the only type of investment excluded from coverage. It would be unreasonable to conclude that the term investment means *only* a purchase of something simply because the dictionary states that an investment can be an outlay of funds with the expectation of a return and also a purchase of assets with the expectation of a return. It is a broad term that means both, which does not make it ambiguous. *See The Bar Plan Mut. Ins. Co. v. Chesterfield Mgmt. Assocs.*, 407 S.W.3d 621, 629 (Mo. App. 2013) (stating that "'[m]ultiple or broad meanings do not necessarily create ambiguity'" because "there is often a deliberate purpose in using a word with a broad meaning or multiple meanings in a contract, namely to achieve a broad purpose").

Moreover, nothing about the phrase "investment in an enterprise" inherently suggests a purchase of an equity interest, as the principal opinion holds. Although the purchase of stock in a particular business with an expectation to make a return would surely qualify, the principal opinion provides no satisfactory reason for concluding that a loan for the same amount of money to a particular business with an expectation to make a return does not qualify in equal measure. The principal opinion assumes that the average business would list loans as debts and not also as investments but provides no support for that proposition. Slip op. at 15-16. The same is true regarding its assumption that equity investments are the "most common examples" of investments. *Id.* at 14.

Even if these assumptions are correct, and even assuming they suggest businesses do not consider their lenders to be investors as a general matter, a particular loan to a

9

particular business may still obviously be an investment. And although it is true that the value of an equity interest in a business is tied to the business's performance, so is the value of the right to repayment of a loan—as evidenced by the interest rate, which reflects the calculated risk that the borrower will default. A reasonable attorney would not have given the investment advice that Wirken gave in this case, but a reasonable attorney who was acting in his or her professional capacity to give investment advice would assume "investment in an enterprise" to mean both a purchase of stock and a loan of money to a particular business.[2]

In the same vein, the principal opinion's conclusion that a reasonable attorney would know that a layperson cannot invest in a law firm begs the central question.[3] Section 356.111.1, RSMo 2000, would prevent a layperson from obtaining an *ownership interest* in securities of a professional corporation, but the statute says nothing of who can *invest* in a professional corporation. "A professional corporation may issue shares, fractional shares, rights or options to purchase shares, and other securities only to the following: ....". *Id.* By stating that § 356.111(1) precluded Taylor from investing in the

---

[2] To illustrate, the definition of investment provided by Black's Law Dictionary uses "bonds held to maturity" as an example of an investment. *Black's Law Dictionary*, at 902. It defines a "bond" as a "written promise to pay money or do some act if certain circumstances occur or a certain time elapses." *Id.* at 200. Clearly an investment in an enterprise can include providing *debt* financing to a business; it is not limited to the purchase of an *equity* share in a business. The principal opinion draws an empty distinction. As previously mentioned, the fact that "investment in an enterprise" can mean providing both debt and equity financing to a particular business does not make the phrase ambiguous. *See Chesterfield Mgmt. Assocs.*, 407 S.W.3d at 629.

Likewise, nothing about the word "enterprise" suggests an investment must be a purchase of an equity share in a business. The principal opinion inexplicably comes to that conclusion from use of the phrase "financial commitment," presumably by some dictionary. Slip op. at 16. The ninth edition of *Black's Law Dictionary* defines "enterprise" as "[a]n organization or venture, esp. for business purposes;" it does not define it as one involving a "financial commitment." *Black's Law Dictionary*, at 611. Regardless, a loan is a financial commitment even though it must be paid back and there is no tenable argument that the Wirken Law Group and Longview were not "enterprises."

[3] The principal opinion states the following as its rationale: "Would a reasonable attorney think that a non-lawyer could invest in his or her law firm? No. Would a reasonable attorney think that a non-lawyer can make a loan, profitable or not, to a law firm? Yes. Can a non-lawyer *invest* in a law firm? No." Slip op. at 19.

10

Wirken Law Group, the principal opinion assumes its conclusion—that the definition of an investment in a professional corporation is limited to a purchase of an equity share. As noted, the policy does not restrict the word "investment" to this narrow definition.

Although loans may not always be considered investments for all purposes, this does not make the policy ambiguous.[4] It is sufficient that no reasonable attorney would conclude that the loans in this case were not investments. The principal opinion holds that the exclusion is ambiguous because, at the time the insurance policy was drafted, an attorney conceivably might conclude, in the abstract, that some loan somewhere may not be considered an investment. Slip op. at 11 n.8 (stating that the court's standard of review is limited to what the parties would believe the contract means at the time of contracting). But coverage disputes are not resolved in the abstract. Wirken created and had control of the undisputed facts of his own legal malpractice insurance coverage question. The investment advice that Wirken gave to Taylor was to make six loans and receive a return on his money. There is no doubt that each loan constituted an "expenditure of money for income or profit."[5] *Webster's Third New International Dictionary* at 1190.

---

[4] The Supreme Court of Missouri has found that loans may not always have been considered investments. *See Hines v. Am. Sur. Co.* (*In re Keisker's Estate*) 168 S.W.2d 96, 98-99 (Mo 1943) (stating that the words "loan" and "invest" are often used interchangeably, but distinguishing an "investment in bonds of the United States" from a loan because the particular statute's use of the word "investment" contemplated a purchase); *see also Oren v. C.I.R.*, 357 F.3d 854, 857-58 (8th Cir. 2004) (holding that a shareholder's loan to a corporation does not constitute an investment for purposes of calculating the shareholder's income taxes, when the transaction was essentially a sham and the shareholder incurred no actual economic outlay); *Ahrens v. Minn. Lawyers Mut. Ins. Co.* 432 F. App'x 143, 149-50 (3d Cir. 2011) (suggesting that loans may not always be considered investments for all purposes but holding that certain transactions were investments, as that term normally is used and as used in the legal malpractice insurance policy exclusion in that case, while emphasizing that the "insured's reasonable expectations" precluded coverage).

[5] At least one of the Longview was a complex transaction, which illustrates why a reasonable attorney would conclude that Wirken's advice was investment advice. Taylor paid $138,000 to Longview up front for a $150,000 loan, in effect paying the interest up front. Slip op. at 5. The whole amount of the loan was due all at once, three months later. *Id.* Although the parties did not arrange this transaction as the purchase of a bond, there is practically no difference. In a zero-coupon bond transaction, the purchaser (the lender) pays the issuer (the

11

It is difficult to find a better word to describe the loans. One must affirmatively avoid using the word "investment." This is apparent from the fact that Taylor himself did not avoid using the term to describe the loans, and even Wirken described the Longview loans as "investments" when pitching the idea to Taylor. Taylor admitted in his Second Amended Petition in the underlying lawsuit that he had sought "investment advice" from Wirken and that "Wirken advised [Taylor] that he was aware of a tremendous investment opportunity" regarding the Longview loans. Although the subjective beliefs of neither Taylor nor Wirken are dispositive of what a reasonable attorney would believe, the fact that both parties referred to the loans colloquially as "investments" illustrates the strained logic required to conclude that these loans were anything but investments in two particular business enterprises.

These six loans were investments in two enterprises—the Wirken Group and Longview. In my view, no reasonable attorney in Wirken's position could have concluded otherwise. There is no "indistinctness and uncertainty," and no one was required to "guess at the meaning" of the policy exclusion just because there is more than one dictionary definition of the word "investment." Slip op. at 16, 19. After reading what the policy excluded, any reasonable attorney would have concluded that advising

---

borrower) something lower than the face value of the bond at the outset, in lieu of receiving the periodic interest payments typical of a run-of-the mill bond (known as "coupon" payments). *Black's Law Dictionary*, at 205. The effect is that the issuer pays the interest up front. *Id.* The bondholder turns a profit at maturity, assuming there is no default, when the issuer pays the bond's face value. *Id.*

This was not a "simple loan," and the transaction sounds complicated because it was. Wirken and Taylor were required to analyze, or at least should have analyzed, the risk of default as reflected in (1) the high interest rate, (2) the short repayment period, and (3) the fact that the borrower was willing to pay the interest *up front*. Each suggests a higher risk of default. The principal opinion nonetheless holds that it is reasonable for a lawyer to conclude that advising his or her client to engage in the practical equivalent of a zero-coupon bond debt financing transaction to a particular business is not advising the client to make an investment in an enterprise.

12

Taylor to make these loans would not be covered by insurance. I would hold that the exclusion is clear and unambiguous and that the court must apply the plain language of the exclusion as it is written. *Gavan v. Bituminous Cas. Corp.*, 242 S.W.3d 718, 720 (Mo. banc 2008).

The principal opinion insinuates that because the fact of *malpractice* is not at issue in this case, neither is the issue of whether Wirken's actions were covered by the insurance policy. Slip op. at 20-21 & n.14. The principal opinion's rationale is that the general insuring clause provides coverage of the malpractice and that the exclusion must be construed strictly against the drafter. But whether an exclusion applies is inherent in the question of whether the policy provides coverage. *See Todd v. Mo. United Sch. Ins. Council*, 223 S.W.3d 156, 163 (Mo. banc 2007) (holding that an insurance policy that provided for a broad grant of coverage in one provision with limits in separate exclusions was not ambiguous, and stating that "[i]nsurance policies are read as a whole, and the risk insured against is made up of both the general insuring agreement as well as the exclusions and definitions").

This court should not resort to canons of statutory construction when policy language is unambiguous. *Gavan,* 242 S.W.3d at 720 (Mo. banc 2008); *Ballmer*, 899 S.W.2d at 525. When there is no ambiguity, the plain language governs. *Id.* It is irrelevant whether that plain language is in the general insuring clause or in a policy exclusion. *See Todd*, 223 S.W.3d at 163. Insurance policies are *routinely* written with policy exclusions, and a reasonable attorney reading the policy would not have ignored the "legal representative of investors" exclusion in determining coverage. Contrary to the

13

majority opinion's use of the phrase "burden of proof," this case was resolved as a pure question of law by the circuit court, which determined the policy provisions were unambiguous. *See Mendenhall*, 375 S.W.3d at 92 (stating that whether a policy exclusion is unambiguous is a question of law). The Bar Plan, based on undisputed facts, demonstrated that the policy unambiguously excluded coverage.

### Summary and Conclusion

The "legal representative of investors" exclusion can be broken down into three elements. It excludes coverage for: (1) claims that are "based upon or aris[e] out of" the insured's capacity as a "legal representative of investors"; (2) when the representation was "in regard to and resulted in an investment in an enterprise"; and (3) when the insured either (a) "owns an equity interest" in the enterprise in which the investment was made or (b) "receives a fee or commission from an [e]ntity other than the investor" for the investment.

Here, it is undisputed that Wirken was a "legal representative" of Taylor because Wirken was acting within the scope of an attorney-client relationship regarding all six loans. The representation was in regard to and resulted in an "investment in an enterprise" because, as discussed, Taylor's interest-bearing loans to the Wirken Law Group and Longview were well within the definition of "investments in enterprises," as a reasonable attorney would understand that phrase. This made Taylor an "investor." As to the first set of three loans, Wirken was the sole owner of the Wirken Law Group— which was "the enterprise invested in." And as to the second set of three loans, Wirkin

14

received a commission based fee from Longview—which was "an Entity other than the investor." All three elements of the policy exclusion are met.[6]

In my view, the circuit court did not "miss a step" in its analysis. Slip op. at 18. It correctly determined that the loans were investments. I agree with the circuit court's legal conclusion that Wirken could not have reasonably expected that his actions in soliciting and facilitating loans from his client to his own law firm and to another client would be covered by his malpractice insurance policy, given the language of the policy exclusion. I would affirm the circuit court's judgment that The Bar Plan is entitled to judgment as a matter of law.

/s/ Zel M. Fischer
_____
Zel M. Fischer, Special Judge

---

[6] Taylor also presents two claims that the principal opinion does not address: (1) that even if the policy exclusion is unambiguous, it does not apply to this claim, and summary judgment was inappropriate because some of Wirken's actions did not fall within the exclusion; and (2) that The Bar Plan did not prove that the exclusion applies because the policy's use of the word "and" to connect four different exclusions means The Bar Plan was required to meet all of them. These claims are also without merit. In light of the scope of the issues discussed in the principal opinion, I do not address these arguments here.

15